BETTY F. LARRIMORE, widow and Administratrix of the Estate of Charles H. G. Larrimore, Plaintiff, v. HOMEOPATHIC HOSPITAL ASSOCIATION OF DELAWARE, a corporation of the State of Delaware, Defendant.

(*December* 1, 1961.)

Stiftel, J., sitting.

*Harold Leshem* and *Harvey B. Rubenstein* (of Leshem and Rubenstein) for plaintiff.

*Rodney M. Layton* (of Richards, Layton and Finger) for defendant.

Superior Court for New Castle County, No. 352, Civil Action, 1960.

STIFTEL, J.:

Plaintiff, Betty F. Larrimore, administratrix of the estate of her late husband, Charles H. G. Larrimore, brought an action against Homeopathic Hospital Association of Delaware ("Hospital") based on the negligence of one of its nurses in the treatment of her late husband. This was not a death action. There was no claim made that the negligence was responsible in any way for the death of Mr. Larrimore. This action was brought by Mrs. Larrimore on behalf of her husband. It is an action which he would have been entitled to bring if he had been living. The jury returned a verdict of $30,000.

This matter is presently before the Court on defendant's renewal of its motion for a directed verdict or, in the alternative, for a new trial.

The facts upon which the action was maintained are as follows:

Charles Larrimore, deceased, was a test engineer for All American Aviation. In February, 1954, he was hospitalized because of a retinal hemorrhage, and while he was in the hospital a kidney condition known as chronic glomerulonephritis[1]

---

[1] A chronic disease of the kidneys characterized pathologically by fibrosis and hyalinization of the glomeruli, the degeneration of the tubules, and by progressive renal insufficiency.

A layman's explanation of this condition is: An inflammation of various elements of the kidney, which gradually become obliterated by scar tissue and the collecting system that transports the urine from the filtering element down to the larger tubes of the kidney starts to degenerate and consequently ceases to function. The small blood vessels which supply the nutrient to parts of the kidney also become scarred and degenerated, and as these elements are damaged, waste materials can no longer be excreted. When the retention of the waste products reaches a point at which the body is unable to compensate, renal insufficiency occurs, and if this condition progresses, the body can no longer sustain life.

was diagnosed. This hospitalization lasted for approximately six or seven weeks, and during the hospitalization, Mr. Larrimore temporarily lost his sight, which soon returned to him upon his release from the hospital. After his release from the hospital he returned to work and was able to perform his duties; he also obtained a commercial pilot's license.

During 1957 Mr. Larrimore began receiving treatment from Dr. Stanley Verbit, an internist. On September 15, 1959, he was hospitalized by the doctor in an attempt to control his hypertension, which had deteriorated from a benign phase to a malignant type of hypertension, which was superimposed on the glomerulonephritis with renal failure. Dr. Verbit stated that if Mr. Larrimore's condition was permitted to remain as it was at the time of hospitalization, it could be expected from the natural history of this disease that he would live about 3 months. Therefore, the hospitalization was a last, desperate effort to try to reverse the difficulties Mr. Larrimore was encountering by trying to convert the malignant phase of hypertension into an ordinary phase of hypertension. It was understood that if one could convert this malignancy downward, Mr. Larrimore's prognosis would be improved. When Mr. Larrimore was admitted into the hospital, this problem was carefully explained to his wife.

The doctor determined that in order to reduce the blood pressure to a safe level, it was necessary to use a ganglionic blocking agent, and he selected a drug known as ansolysen in an attempt to manage the hypertension.

In starting the use of the ansolysen, it is not known what dosage is required or at what dosage undesirable effects may be produced. Consequently, a small arbitrary dosage of ansolysen is used in the beginning. In determining the dosage to be used on Mr. Larrimore, the doctor took into consideration that Mr. Larrimore was suffering from a chronic kidney disease and decided that the administration of this drug was to be initiated intramuscularly. Up until October 1, 1959, the

patient received no more than two milligrams of this drug parenterally through the muscle at each injection. By adjusting and using different dosages of this drug, varying degrees of blood pressure decrease may be selectively produced. The dosage that can be used to produce favorable degrees of blood pressure is limited by the side reactions that may be produced. The higher the dosage, the more potent the side reactions and the more troublesome the side reactions may become. One of the side effects of the use of ansolysen is related to a decrease in the ability of the kidneys to function.

On October 1, 1959, Dr. Verbit determined that the use of parenteral injections of ansolysen was no longer justified in the attempt to obtain control of the patient's blood pressure because his renal function, instead of improving, had deteriorated so that there was no longer any hope that the kidney disease could be controlled. Thus, since the attempt of the doctor to convert the hypertension from the malignant type to a less serious type was not accomplishing the desired purpose, it was decided to discontinue the intramuscular injections of the drug. Generally, it is considered dangerous to discontinue this type of treatment abruptly, once it is started, because there is a tendency that the hypertension will rebound and result in greater injury to the kidney. Because the doctor determined that the disease of the kidney could not be halted, he discontinued the parenteral administration of the drug and ordered the drug administered orally. Thus, on October 1, 1959, at 8p.m., the parenteral method was discontinued and the oral method was begun. The doctor stated that after his order for oral administration of the drug, it was clear that it was now only a matter of time before the patient's ultimate demise would occur.

The entry on the hospital record for Mr. Larrimore on October 1, 1959, states:

"With diastolic now approaching 110 parenteral medication discontinued. Oral Ansolysen, 20 milligrams, three times a day started."

The entry on the order sheet of October 1, 1959, which constitutes direct order from the physician to the nursing staff, states:

Discontinue parenteral Ansolysen at eight p.m. Give oral Ansolysen, 20 milligrams, at eight p.m., 10-1-59, then 20 milligrams at eight p.m. and two p.m., on 10-2-59."

The entry on the order sheet for October 2, 1959, states:

"Continue Ansolysen by mouth today and 10-3-59."

The entry on the order sheet for October 4, 1959, states:

"Increase Ansolysen, 30 milligrams at eight p.m., 30 milligrams at two p.m., and 30 milligrams at 8 p.m., on 10-5-59."

A nurse, who had administered the intramuscular injections, went off duty on Thursday, October 1 and remained off duty on Friday, October 2. She reported back to duty on Saturday, October 3, but did not administer any ansolysen on that day. On October 4 she saw Dr. Verbit at approximately 8 p.m., after he had been in Mr. Larrimore's room, at the hallway desk. He had written orders on Mr. Larrimore's sheet and he had handed her the sheet. She read the order for October 4 and asked him if he wanted her to give 30 milligrams of ansolysen. He replied: "Yes". The nurse repeated: "30?", and he again said: "Yes". The doctor then left the floor. The nurse fixed the medication and returned to Mr. Larrimore's room. She explained to Mr. Larrimore that she had a needle for him and he stated that he was not to get any more needles. Mrs. Larrimore, who was in the room with her husband at the time, explained to the nurse that the doctor had said he was not to have any more needles. Whereupon the nurse re-read the sheet and explained to the Larrimores that he was going to receive this needle. Mr.

Larrimore again exclaimed that he could not understand it since Dr. Verbit had indicated that he was to receive no more needles. However, he finally agreed, on the nurse's insistence, and pulled up his sleeve so that she could inject the needle containing 30 milligrams of ansolysen. The nurse then told him he was to receive a similar shot the next day, on October 5. He stated that he would not take any more needles. Whereupon, the nurse stated that she would call Dr. Verbit. She went out of the patient's room and called the doctor, who was at his home about 12 miles from the hospital. She then learned for the first time that the 30 milligrams of ansolysen were to have been administered by mouth rather than by needle.

There is no doubt that the dosage given on October 4 to Mr. Larrimore was given in error and the entry on the physician's notes as of 10 p.m. on October 5, 1959, makes this clear in that it states:

"Patient given 30 milligrams Ansolysen intramuscularly by error. No satisfactory explanation for this has been obtained. * * * Situation explained to patient."

Upon learning of the error, the physician ordered certain precautionary steps to be taken and returned to the hospital from his home; Mrs. Larrimore, who had gone home for the evening, was notified and returned to the hospital. The knowledge of the error caused much activity by hospital personnel. They went in and out of the room often and the order sheet reveals that the following steps were ordered: Special duty nurses were to be supplied around the clock by the hospital and these nurses were to take patient's blood pressure every 15 minutes and record it. Shock blocks were to be removed from the head of the bed and patient was to be given glucose intravenously with a Y-type tubing. The patient had been sitting in a chair in his room on October 4, 1959, and after the injection, complained of violent headaches and loss of vision, and was patently disturbed.

The excess ansolysen had no major effect on Mr. Larrimore physically. He was physically inconvenienced by being required to have the glucose given to him intravenously. However, this required only one "piercing of the skin" and other parenteral medication found necessary to counteract the ansolysen was to be given him through the same intravenous tube. The glucose needle was large and painful and several times the liquid stopped flowing through the tube and had to be restarted. Furthermore, the evidence revealed that Mr. Larrimore was required to be a bed patient for a longer time than would otherwise have been necessary, and also, as a consequence of the excess dosage, he had headaches and temporary loss of vision. His blood pressure, however, never fell below a safe level and his renal function did not decrease even though his blood pressure had dropped.

Plaintiff's primary claim for damages is based on the change of mental attitude of Mr. Larrimore as a consequence of receiving the excess dose of ansolysen. Although Dr. Verbit testified that Mr. Larrimore was often depressed and melancholy in the hospital prior to the erroneous dose, there is, nevertheless, evidence in the record which demonstrates that Mr. Larrimore was very pleasant, optimistic and happy before the accident, but immediately after the overdose of ansolysen, he lost his optimistic outlook and became melancholy and depressed. Mr. Larrimore's sister, Elizabeth Edwards, stated that prior to the accident, she visited her brother frequently in the hospital and that before October 4 he was very encouraged, cheerful and optimistic, but when she saw him on Monday morning following the accident, after the "awful mistake", he appeared to be shocked physically, morally and spiritually, and that she saw him go down dreadfully until he died. A patient in the same room with Mr. Larimore stated that prior to October 4 he was cheerful, and on Saturday, October 3, he told jokes all afternoon, but that after the accident he became depressed and "snapped at people".

Mrs. Larrimore demonstrated his optimisim by explaining that before her husband entered the hospital he had been looking at automobiles and that after he had been in the hospital several days he ordered two compact cars and was trading in his old car. She explained that it would have been very unlikely that he would have made this transaction if he had thought he was not going to be able to use the car, since he would not have been interested in making a debt for her. Also, he had arranged with his wife that she could be his eyes while at work, when he was released, so that he might carry out some duties in his employment. He considered that this would be better than merely staying around the house and having his wife read to him or listen to music, which was generally all that he could do. Mrs. Larrimore then explained that after October 4, he made no plans at all, did not have the same attitude he had had in the past and was, in fact, a different person. She added, in her opinion, it appeared that the overdose was one more thing added to what he already had, and this was more than he could fight—"he couldn't take it".

Dr. Verbit testified that he had given Mr. Larrimore no definite date as to when he could leave the hospital and go home. He stated that he explained to Mrs. Larrimore that as soon as her husband was able to reach a point where he could take special medication at home and where he could be successfully managed by her, he would allow him to go home. Mrs. Larrimore stated that Dr. Verbit talked to her about her husband going home and assured her that as soon as his blood pressure stabilized he would send him home for drug treatment, and that Mr. Larrimore was very happy at learning that he was going to be sent home. She said she understood that he was to go home sometime the middle of the week of October 5—around the 6th, 7th or 8th—and that by reason of the excess dose of ansolysen, he did not arrive home until October 17. When he did come home, she said, his attitude was different, the "fight was gone out of him", and

it appeared that he was no longer sure he could "make the grade". He was returned to the hospital on October 26 and died on October 30.

Dr. Verbit testified that the excessive dose of ansolysen did not hasten Mr. Larrimore's death. Both parties agreed that the excessive dose had in no way shortened Mr. Larrimore's life. Dr. Verbit testified that he had explained to Mr. Larrimore that the degree of blood pressure control which he had hoped to obtain was no longer possible, that he was unable to halt the disease of the kidney, and that there was no longer any hope to keep him alive. He further explained that Mrs. Larrimore may not have been aware of this because Mr. Larrimore had requested that he not notify her of his condition. The doctor explained, Mrs. Larrimore never became aware of the critical situation of her late husband in those last days during his lifetime, and that she learned of his desperate condition in those days for the first time when she was present for her deposition in these proceedings.

Defendant did not move for a directed verdict at the termination of its case, but did move for a directed verdit after the termination of the entire proceedings. Defendant, after verdict and entry of judgment, filed its motion for directed verdict or, alternatively, for a new trial.

In support of its motion for directed verdict, defendant contends:

(1) That plaintiff was required to produce expert testimony to support her claim of negligence on the part of the defendant;

(2) that plaintiff's decedent consented to the injection; and

(3) that plaintiff is not entitled to maintain her action for decedent's pain and suffering and mental anguish because there was no actionable physical injury.

Defendant's motion for a new trial is based on the ground that the verdict was unconscionably excessive in amount.

Defendant first argues that this Court should have directed a verdict for defendant at trial because plaintiff failed to produce expert testimony pertaining to the professional standards required and practiced by nurses in hospitals in the community, and that as a result the jury could not perform its function in determining whether the nurse in question practiced that degree of care and skill generally exercised by nurses in hospitals in the community.

On the issue of the nurse's negligence, it is true ordinarily that evidence of the requisite skill and care exercised by a nurse generally should come from experts. *Wilmington General Hospital v. Manlove, Supreme Court Del.*, 174 *A.* 2d 135, decided October 12, 1961; *Stickelman v. Synhorst*, 243 *Iowa* 872, 52 *N. W.* 2d 504. Anno. 141 *A. L. R.* 5, 6. However, this rule may be modified in cases where the subject matter relates to evidence that is within the understanding of the ordinary juror. In *Christian v. Wilmington General Hospital Association*, 11 *Terry* 550, 135 *A.* 2d 727, 730, an action was brought against the hospital because of the alleged negligent failure of an intern to diagnose properly and treat severed tendons in plaintiff's hand. The Supreme Court, in affirming the directed verdict below, noted:

"It is, of course, obvious that in some instances a jury of laymen could determine without the testimony of experts that a treatment given was so unrelated to the injury or illness of the patient as to make obvious to anyone the failure of the doctor to exercise acceptable standards of care."

The injured patient should not always be thrown out of Court when he is unable to produce expert testimony to prove his allegations of negligence. However, the requirement of medical testimony must be met if "the matter under investigation is intricate and abstruse or so little understood" that

ordinary jurors would in all probability have difficulty in arriving at a conclusion without such testimony. But expert testimony is not essential where the results of the treatment are of such character as to warrant the inference of want of care from the testimony of laymen or in the light of the knowledge and experience of the jurors themselves. 70 *C. J. S.* Physicians and Surgeons § 62, pp. 701, 1009. In the performance of her professional duties, a nurse is required to exercise ordinary or reasonable care to see that no unnecessary harm comes to her patient. *Anno., Nurses' Liability,* 51 *A. L. R.* 2d 970, 972.

■■ There is evidence in this case from which a jury could conclude, without the aid of experts, that the nurse failed to exercise ordinary care. The October 4, 1959 order was not clear, unless read in conjunction with the entries on the order sheet for the preceding days. The entry for October 4, and the entries for the preceding days were on one sheet of paper, although the entries for the days immediately prior to October 4 were covered with various short sheets of paper, which could have been raised or withdrawn so that the previous days' orders could have been seen. If this procedure had been followed, after the protests by the Larrimores, the unfortunate incident could have been avoided, since the previous entries made it clear that the ansolysen was to be administered orally. The jury was entitled to conclude from the evidence most favorable to the plaintiff that the nurse used less than ordinary care under the circumstances. Furthermore, the testimony of some of the experts could be interpreted as indicating a lack of care on the part of the nurse. The head nurse was quoted as having stated that she could not understand how this had happened and that it would be a "long day" before another similar mistake was made in the hospital. Also, the doctor was alleged to have remarked that the nurse had made a very bad mistake.

Naturally, the extent and type of care that a nurse owes a patient depends on the circumstances of each case. Whether or not the circumstances in this case amounted to negligence on the part of the nurse was properly one for the jury and was properly submitted to them.

■ Defendant next contends that the plaintiff's decedent, after an original protest, finally consented to the intramuscular injection of ansolysen by the nurse, who had no knowledge that her act might be harmful, and that as a consequence of his consent there can be no liability. Consent generally prevents the actor's conduct from being tortious and therefore prevents him from being liable to the person who has given his consent to the invasion of his interest. *Restatement, Torts,* Sec. 49(b).

■ This Court cannot hold from the circumstances of this case that the plaintiff's decedent consented to the overdose of ansolysen by parenteral administration which the nurse mistakenly believed was ordered by the doctor. This patient and his wife vigorously objected to the intramuscular injection. They were both told that the doctor had ordered the injection after the nurse consulted with the doctor in the hall. When the patient reluctantly permitted the injection, he agreed only to a lawful and proper administration of the drug, but not to an overdose. There are no facts in this case which would indicate that the patient had any advance knowledge that he was receiving a dose of ansolysen which was 15 times greater than the injections he had received prior thereto. Certainly the patient did not consent to any careless act by the nurse. It is immaterial that she did not know of the harmful effects of her act upon the patient.

■ Defendant next urges that plaintiff cannot recover for decedent's pain, suffering and mental anguish because there was no physical impact.

I find it unnecessary to determine if plaintiff can recover for emotional disturbances absent physical impact in this jurisdiction. There was physical impact here. The nurse injected the plaintiff's decedent with an extraordinarily large needle containing an overdose of a potent drug from which he suffered immediate and spontaneous physical reactions. This allegedly started the chain of circumstances which could have resulted in decedent's personality change. For instance, after the needle was inserted through the flesh of the decedent, he complained that he was unable to see, everything was getting black and that "something awful" was happening to him. At the same time, he was shaking. Certainly the injection of a large needle containing an overdose of drug was an unauthorized impact which had immediate physical and emotional repercussions.

The defendant admits that proof of pain and suffering and emotional disturbance are compensatory when accompanied by physical impact. My finding that impact was present, therefore, ends this argument, and leads me to decide that no verdict should have been directed on the basis proposed by the defendant.

I now turn to defendant's motion for a new trial on the ground that the verdict was excessive in amount.

Plaintiff's primary claim for damages is based on her husband's personality change that took place after the overdose of ansolysen. The evidence indicated that before the injection, the plaintiff's decedent was always optimistic about his ultimate recovery, and that even though he understood the nature of his illness, he continued to be a pleasant and contented individual. After the overdose, the evidence revealed that decedent appeared to lose hope, adopt an attitude of "What's the use?", and generally became a melancholy individual. The only medical evidence presented by the plaintiff was the testimony of the treating physician, who explained that, in his opinion, Mr. Larrimore's attitude had not changed

as a result of the overdose. He explained that Mr. Larrimore had understood the hopelessness of his condition since October 1, at the time he was taken off the intramuscular injections and put on oral ansolysen. The doctor explained that the decedent was constantly pensive and troubled, but that his attitude had not been conveyed to his wife because he wished to keep from her the sad news which he had learned about his hopeless condition and that he had also asked the doctor to refrain from informing his wife of his desperate condition. The lay witnesses' testimony as to the changed mental attitude of Mr. Larrimore was based on their analyses of how he appeared to them, rather than the decedent's complaints. For instance, Mr. Larrimore never informed any of the witnesses that he had given up hope; they merely testified that it appeared to them as if he had.

The jury has a broad discretion in determining the amount of damages in a personal injury case. However, the trial court has responsibilities, which it must assume, upon its recognition that there has been a recognizable injustice in the rendering of a verdict. In fact, judicial control over the size of verdicts is a safeguard against abuse in cases where the plaintiff's essential grievance is of an intangible sort. It is obvious that the determination of whether or not a verdict is excessive is difficult. Each case rests on its own facts and circumstances. *Lacey v. Beck, Del. Super.*, 161 A. 2d 579, 581.

Plaintiff's major complaint was that Mr. Larrimore lost his optimism concerning his recovery and that he became depressed because of the overdose. The damages proved which could be reasonably attributable to the overdose were not of any substantial nature but were, when observed in proper perspective, of a temporary physical and mental disturbance.

Emphasis was placed on the injury Mr. Larrimore suffered as a result of the parenteral administration of the glucose solution which was required as a result of the overdose. The doctor stated that this was a major reason for decedent's

mental disturbance because he had become weary and uncomfortable from so many other injections. While it is true that the glucose injection would not have been necessary if there had been no overdose, and while it is true that it may have proved uncomfortable, it is, however, a matter of common knowledge that needle injections have become commonplace today. Hardly a person exists in this country who has not had injections of one kind or another, and it is generally not considered such an event that should bring marked disturbance upon an individual. *Bauer v. Otis and Hayes*, 133 *Cal. App.* 2d 439, 284 *P.* 2d 133, 136.

An analysis of the testimony leads me to the conclusion that the award of $30,000 is grossly disproportionate to the injuries shown, so as to indicate that the verdict was arrived at either from mistake as to the nature of the cause of action and damages suffered or resulted from passion, prejudice, whim or caprice. It is difficult to determine how the jury returned with such a large verdict under the facts of this case. However, there are certain factors which may help to explain why the jury reached its excessive verdict.

The verdict could not be justified if it was based on a death action since all the parties agreed that there was no evidence that the ansolysen was in any way responsible for hastening the death of the decedent. The true nature of the case was explained to the jury; nevertheless, the jury could have placed an erroneous interpretation upon the evidence and concluded that the issue of proximate cause of Mr. Larrimore's death was before them because of the many references, without objection, during trial to the overdose of ansolysen and Mr. Larrimore's subsequent death. For example, Mr. Larrimore's sister testified that as a result of the overdose "he was shocked physically, morally and spiritually" and that she "saw him go down dreadfully until the day he died". Mr. Foster, his brother-in-law, stated that after the overdose, his "mental framework and outlook changed and he became

pessimistic, dumb and indifferent", and that this marked change in him grew progressively worse until the time of his death. The concluding summation of plaintiff's counsel contained remarks which were subject to the interpretation that the drug overdose may have shortened Mr. Larrimore's life. It was mentioned that Mr. Larrimore always hoped that the Divine Being would do something to help him, because everybody clings to life. This may have conveyed to the jury the impression that the changed mental outlook may have contributed in some measure to hastening Mr. Larrimore's death. The jury was also told that some progress was being made with the drug because Mrs. Larrimore intended to take her husband home in the middle of the following week and that he had renewed hope because of the use of ansolysen. Actually, undisputed facts show that any renewed hope had disappeared and that no progress was being made by the continued use of the drug. This was a difficult case to try and taxed the ingenuity of counsel to draw a clear line of demarcation between the claim made by the administratrix for Mr. Larrimore's pain and suffering when he was alive, in contradistinction to a widow's action for the death of her husband. To the extent the jury was able to speculate that this overdose caused or hastened the death of Mr. Larrimore, it was improper.

There is evidence in the record from which the jury might have concluded that the overdose of ansolysen was exclusively responsible for Mr. Larrimore's loss of optimism and depression during the remaining days of his life. It will be recalled that Mr. Larrimore was a dying man. The doctor had told him that there was no longer any hope. There was testimony that decedent's changed mental attitude until the moment of his death on October 30, 1959, was due exclusively to the overdose. Is it not a reasonable inference to be drawn from the admitted facts and circumstances that Mr. Larrimore's depression during the twenty-six days before his death may have been due, in part, to his knowledge that death was "staring him in the face"? Cf. *Wilson v. Derrickson et al.,*

*Supreme Ct. Del.*, 175 *A.* 2d 400 (Nov. 2, 1961). Mr. Larrimore was released from the hospital on October 17, 1959, so that he might spend his last days at home while the disease ran its fatal course. The best evidence indicated that his departure for home was delayed thirteen days as a result of the faulty administration of the drug. The witnesses still blamed the overdose for his depression after he came home. Is it not just as reasonable to assume that decedent's depression was due to his knowledge that death was imminent? Likewise, evidence indicated that his changed mental attitude, caused by the overdose, was responsible for his cancellation of his order for two compact cars, which he had placed when he entered the hospital. Is it not likely that the cancellation of this order came about as a result of his knowledge that there was no longer any chance of survival? The jury was given the opportunity to conclude from the evidence that the overdose was the sole proximate cause of Mr. Larrimore's loss of optimism and depression during the entire 26 days he survived. (*Cf.* Anno., *Proximate Cause of Death—Malpractice Cases,* 13 *A. L. R.* 2d 11, 24, 28). In his summation, plaintiff's counsel explained to the jury that if it had not been for the overdose of ansolysen, decedent may have had twenty-six wonderful, beautiful days on earth, twenty-six days with his family which he loved so well. It is most difficult to comprehend that an individual would have twenty-six wonderful, beautiful days if he knew that it was reasonable to expect that he was going to die on any one of them, since the doctor had given up all hope and had imparted this message to decedent. Even assuming that the jury was legally justified in concluding that the plaintiff proved her husband suffered for twenty-six days as a result of the overdose, nevertheless, this would not justify the high verdict.

Mrs. Larrimore, the widow, was an especially ingratiating and appealing witness. She invoked much sympathy by her quiet, sincere behavior on the witness stand, and her genuine display of love for her husband and family. It was clear

that this lady sadly missed her husband. It appeared that she firmly believed that the overdose of ansolysen was responsible for accelerating her husband's death. In fact, the original complaint in this action included a cause of action for death due to an overdose of ansolysen. The death action, however, was dismissed prior to trial by agreement of counsel. Even though plaintiff dropped the death action, it is doubtful that she ever dropped the idea that the overdose was responsible for her husband's death.

The verdict is grossly excessive. I can only conclude that it must have resulted from the jury's failure to understand the nature of the case and the actual damages suffered or that it was the result of passion, prejudice, whim or caprice. Under Superior Court Civil Rule 59, *Del. C. Ann.*, the trial judge has discretion to order a partial new trial. Rule 59 was intended to prevent the retrial of any issue already properly decided and to limit any new trial only to those issues which were incorrectly decided. *Cf. Yates v. Dann, D. C. Del.,* 11 *F. R. D.* 386, 392. Where the issue of liability may be severed from the issue of damages, a new trial on the latter issue alone is proper if it can reasonably be said that the liability issue has been determined by the jury. This is a proper case where the issue of liability is clearly severable from the issue as to the amount of damages. I therefore order a new trial on damages alone.