PAN AMERICAN PETROLEUM CORPORA-
TION, a Delaware Corporation, Ap-
pellant (Defendant below),

v.

Leon Preston LIKE, Appellee (Plain-
tiff below).

No. 3122.

Supreme Court of Wyoming.

May 1, 1963.

Oscar E. Swan, Jr. and Edward E. Murane, of Murane, Bostwick McDaniel & Scott, Casper, for appellant.

Ernest Wilkerson and Robert J. Murphy, of Mahoney & Murphy, Casper, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

Pan American Petroleum Corporation has appealed from a judgment against it based upon a personal-injury verdict. The verdict was given by a Natrona County jury to Leon Preston Like in the amount of $186,748.95.

The accident from which the litigation arose occurred in the fall of 1957 while Mr. Like was employed as a driller by Loffland Brothers, a drilling firm engaged in the drilling and completion of a gas well in Fremont County, Wyoming, for Pan American. The well was the fifty-third well drilled by Loffland Brothers for Pan American in the same county and field.

The work was being done under a day-work drilling contract. Loffland operated in a customary manner to the extent that it had a driller in charge of each eight-hour tower and a toolpusher in charge of the three daily towers. Like's immediate superior was Paul Waid, toolpusher for Loffland Brothers on this particular well. The

representative of Pan American on the well was Erwin Parker Swann.

During completion operations, gas from the well got out of control. A fire ensued and plaintiff-Like was severely burned and injured. The injured workman sued to recover damages from Pan American, owner of the well, on the theory that Pan American was negligent in one or both of the following particulars:

(1) That it failed to specify or require an adequate blowout preventer.

(2) That it failed to specify and furnish drilling mud of the proper weight and consistency.

The contract between Pan American and Loffland Brothers for the well here involved, No. 53, was on a printed form which could cover a situation where ordinary drilling was on a footage basis and completion work on a day-work basis. However, for this well both the drilling and completion were contracted for on a day-work basis.

Although printed portions of the contract specify, in paragraph 5(c), that when operations are on a footage basis the contractor shall be liable for all claims arising as a result of blowouts, explosions or accidents incident to drilling operations, when there are completion operations, the following is specified:

"6. When Pan American shall use Contractor's crew, drilling machinery, and drilling equipment in the performance of work necessary for coring, logging, perforating, acidizing, setting liners, swabbing, installing connections, abandoning and other items of work and labor, commonly known as 'day work,' it is agreed:

"(a) All day work shall be subject to and under the direct supervision of a designated representative of Pan American."

Inasmuch as the operations being conducted at the time of the accident were admittedly completion operations and there were no operations on a footage basis, there

can be 'no dispute that paragraph 6(a) was operative, and all work at the time of the accident was subject to and under the direct supervision of Pan American's designated representative, Swann.

It is undisputed that Pan American specified and Loffland Brothers furnished, for use on this well, a Shaffer double-gate hydraulic-controlled blowout preventer. It included pipe rams which could be closed, in case of an emergency, around pipe or tubing which is round in shape. It also included blind rams which could be closed, in case of emergency, when nothing at all was inside the preventer. It did not include any kind of device for closing, in case of an emergency, around the kelly which is square or hexagon in shape. No other blowout preventer equipment was specified or furnished.

According to the witnesses who testified on the matter, about 38 feet of the kelly was beneath the rig floor and inside the well just before the accident occurred. This meant that the kelly extended through the inside of the blowout preventer and rendered it useless unless and until the kelly could be lifted out. Attached to the kelly and inside the well was tubing extending to a depth of approximately 8,570 feet. The tubing was being used for drill pipe.

Swann, on behalf of Pan American, had directed a cleaning out and circulating operation. He had specified the depth for the bottom of the drill pipe, but he had not specified where the bottom of the kelly should be. In other words, he had not instructed in exact terms for or against having the kelly through the blowout preventer.

The evidence was in conflict on the question as to whether the kelly needed to be through the blowout preventer, but it seems to be undisputed that Waid and not Like placed it there and directed what should be done next. The accident, however, happened immediately. Both Waid and Like indicated by their testimony that, after a workman warned of gas blowing out, every-thing possible was done to withdraw the kelly and close the blowout preventer. The explosion and fire occurred before this could be done.

### Standard of Care

It is the contention of defendant-Pan American, as stated by its attorneys, that plaintiff-Like failed to establish by the evidence a duty or standard of care for the drilling of the well in question; that no common practice or custom of the drilling trade or profession was established; and that in failing to set forth such a standard it would be impossible to establish a breach of a nonexistent duty or standard. The trial court, defendant claims, erred in failing to recognize this basic tenet of the requirement on plaintiff to establish *a duty, a breach thereof, and resulting damages.*

Subsequent to the trial of this case in the district court, we reaffirmed, in Govin v. Hunter, Wyo., 374 P.2d 421, 422-423, the principle that in malpractice suits it is necessary for a plaintiff to prove by the evidence of competent experts that the injury complained of was caused by negligence. We stated in fact that we do not understand how a jury could possibly find the existence of negligence in a malpractice case without a standard to go by.

We now understand it to be the position of Pan American that a similar principle should control in the case before us, and that the trial court's action in permitting the case to go to the jury had the effect of allowing the jury to determine and apply its own standard of care.

Before extending the malpractice rule to other cases, we must of course look at the reasons for the rule and see whether they apply to the case being considered. In that regard, it is quite apparent the standard of care, against which the acts of a physician in a malpractice action are to be measured, is a matter peculiarly within the knowledge of medical experts and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of laymen.

Sinz v. Owens, 33 Cal.2d 749, 205 P.2d 3, 5, 8 A.L.R.2d 757; Beane v. Perley, 99 N.H. 309, 109 A.2d 848, 850.

Common knowledge and the experience of ordinary laymen do not equip them to give the answer, in the usual malpractice suit, without the aid of expert medical testimony; but even in a malpractice action, expert testimony is not essential where the results of the treatment are of such character as to warrant the inference of want of care from the testimony of laymen or in the light of the knowledge and experience of the jurors themselves. Lince v. Monson, 363 Mich. 135, 108 N.W.2d 845, 849; Larrimore v. Homeopathic Hospital Association of Delaware, Del., 176 A.2d 362, 367; Merola v. Stang, Fla.App., 130 So.2d 119, 120. Examples, as mentioned in the Merola case, are where a wound was permitted to heal superficially with nearly half a yard of gauze deeply imbedded in the flesh; or where part of a patient's tongue was cut off in removing adenoids. Other examples are cited in the Annotation 141 A.L.R. 5, at 12 et seq.

We are given no reason to assume the standard of care, against which the acts of defendant are to be measured in the case at bar, is a matter peculiarly within the knowledge of experts. Indeed the matter would appear to be within the common knowledge and experience of laymen and the jurors themselves. See Bonczkiewicz v. Merberg Wrecking Corporation, 148 Conn. 573, 172 A.2d 917, 921.

Mr. Justice Parker, speaking for our court in Yeoman v. Fulton, Wyo., 366 P.2d 694, 696, quoted and adopted text authorities for the proposition that negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm, and that the standard of conduct must be such as would be adopted by a reasonable person under like circumstances; also that the issue of negligence presents a number of points which must be resolved by the court, including the existence or nonexistence of a duty and both the general and special standards of conduct applicable under the circumstances.

Again in Lore v. Town of Douglas, Wyo., 355 P.2d 367, 370, Justice Parker pointed out that testimony pertaining to negligence would be more explicit and definitive if there were presented to the court a requisite standard of care and a recitation of the occurrences which are claimed to violate such standard.

In the present case, that was done. Plaintiff alleged in his complaint that defendant failed to specify or require an adequate blowout preventer, and that it failed to specify and furnish drilling mud of the proper weight and consistency. The case was tried on that theory and the court instructed the jury accordingly. It was made clear to the jury what Pan American's duty was, and with respect to standard of conduct, the court instructed as to a general rather than a special standard by saying negligence is a failure to observe for the protection of others that degree of care which the circumstances justly demand; in other words, it is the want of that care which an ordinarily careful person would exercise under all the circumstances of the case.

Counsel for the oil company have insisted that the standard of care, against which the acts of defendant-company should be measured, is that which on the average is exercised in the industry. The case of Citizens Coach Company v. Collier, 233 Ark. 912, 348 S.W.2d 873, and other authorities are cited. For the most part, however, the cases cited have to do with businesses which involve very little risk as compared to the ultrahazardous activity involved in the instant case. The difference, we think, will become apparent from our subsequent discussion.

### Was the Standard Applied Proper?

In considering whether or not the jury in this case appears to have used a proper or improper standard of care, against which to measure the defendant's actions, we think it was entitled to consider the

dangerous character of the agency with which defendant was dealing. The testimony of witnesses discloses Pan American was drilling its fifty-third well in the Beaver Creek area, a known gas field, with other producing gas wells in the vicinity.

Prior to the accident an electrical log of the well had been run by Schlumberger Well Surveying Corporation. Also, a drill-stem test had been made in the formation which was being treated. These tests indicated the presence of gas, and the well was perforated at the section tested. On the day previous to the accident a hydraulic-fracture process, sometimes called "sand frac" treatment, was performed in the known gas producing formation. The purpose of this treatment was to stimulate the formation so as to enable the production to come out more freely.

Attorneys for Pan American admit in their brief that the drilling and completion of an oil well "is always a hazardous undertaking," and that serious accidents can and do occur. Consequently, the standard of care which the jury was entitled to apply in deciding whether defendant was negligent must be measured on the basis of the hazards known to exist.

In making this statement, we think we are justified in adopting certain guides set forth in 65 C.J.S. Negligence § 66, pp. 557–558, and in 38 Am.Jur., Negligence, § 85, pp. 743–744. We confine ourselves, however, to the following which seem to be supported by a clear weight of case authority:

■ ■ 1. It is generally the rule that a person knowingly dealing with a dangerous agency must exercise care commensurate with the danger of injury involved. In other words, he must exercise ordinary care, having regard to all of the circumstances involved. Williams v. Atlantic Coast Line R. Co., 5 Cir., 190 F.2d 744, 747; Dow v. Holly Manufacturing Company, 49 Cal.2d 720, 321 P.2d 736, 740; Robert R. Walker, Inc., v. Burgdorf, 150 Tex. 603, 244 S.W.2d 506, 508–509; Runkel v. City of New York,

282 App.Div. 173, 123 N.Y.S.2d 485, 488–489; Farmers Home Mutual Ins. Co. v. Gustafson & Larson Co., 73 S.D. 313, 42 N.W.2d 605, 606.

■ 2. A higher degree of care is required in dealing with a dangerous agency than in the ordinary affairs of life or business which involve little or no risk. This care is sometimes described as a high degree of care, or a very high degree of care, or in some instances as the utmost care or extreme care. Warner v. Santa Catalina Island Company, 44 Cal.2d 310, 282 P.2d 12, 16–17; Carr v. Kentucky Utilities Company, Ky., 301 S.W.2d 894, 898–899; Kuhns v. Brugger, 390 Pa. 331, 135 A.2d 395, 400, 68 A.L.R.2d 761; Helm v. South Penn Oil Company, 382 Pa. 437, 114 A.2d 909, 911; Branstetter v. Robbins, 178 Kan. 8, 283 P.2d 455, 460.

■ 3. While no absolute standard of duty in dealing with dangerous agencies can be prescribed, it is safe to say in general terms that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken. Rakowski v. Raybestos-Manhattan, Inc., 5 N.J.Super. 203, 68 A.2d 641, 643; Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 852, 160 A.L.R. 449; MacDougall v. Pennsylvania Power & Light Co., 311 Pa. 387, 166 A. 589, 592; La Plant v. E. I. Du Pont De Nemours and Company, Mo., 346 S.W.2d 231, 240; Independent-Eastern Torpedo Co. v. Price, 208 Okl. 633, 258 P.2d 189, 197.

■■ In view of the admitted and proven hazardous circumstances connected with Pan American's well, we cannot say as a matter of law that the jury applied an erroneous standard of care. Therefore, the narrow question in this case boils down to whether we can say as a matter of law that Pan American used every reasonable precaution suggested by experience and the known dangers of its well. If there was any substantial evidence of a failure in this regard, then a question of fact for the jury was presented.

*Sufficiency of Evidence*

The record in this case is unusually voluminous, and we do not purport to discuss all of the evidence offered to the jury. It is enough to say we have carefully reviewed all of the evidence, with particular attention to the portions referred to in the parties' briefs, and that we find it sufficient to support the verdict of the jury. It is the function of an appellate court to ascertain whether or not there was substantial evidence upon which the jury could base its opinion if it believed the testimony. It is not for us to evaluate the evidence presented. Culver v. Sekulich, Wyo., 344 P.2d 146, 156.

In order to demonstrate briefly that substantial evidence was offered in support of plaintiff's allegations of negligence, we will point out that testimony was given in considerable detail by several witnesses to the effect that the unfortunate accident here involved could have been prevented by a Hydril blowout preventer. It is a type of preventer with a vulcanized rubber collar capable of closing around any object in the well whether square, round or another shape. Thus, it would close around a kelly.

A second kind of blowout preventer which Pan American could have used, according to some of the witnesses, was a circulating or rotating-head type. With this type of preventer, when gas emerges from the hole it is in effect siphoned off from the well site and is disposed of at a point distant from the well and rig, so that it does not constitute a hazard.

A further suggestion made by witnesses was that the possibility of an accident would have been reduced if salt water had been used in lieu of drilling mud in the well, or at least some kind of lower viscosity fluid. In that connection some of the testimony of Swann, Pan American's representative on the well, can be construed as indicating there would have been less danger of gas cutting the mud and resulting in an accident if Pan American had used a lower viscosity fluid, such as salt water, in its completion operations.

It is fair to say that several admissions were made by employees and witnesses of Pan American to the effect that the placing of a rotating head or a Hydril preventer on the well might have prevented the fire; that other things were on the market and other things could be done. Also, there were admissions that the viscosity of the drilling mud or type of fluid used was most important in the control of gas.

But despite this array of evidence and admissions as to things which could have been done, Pan American's attorneys are adamant in their insistence that an "adequate" blowout preventer was furnished as long as Pan American furnished what was generally and customarily used; and that Pan American furnished "proper" drilling mud and fluid as long as it furnished the usual or ordinary.

This position and attitude is typified in the testimony of Swann, who in answer to a question as to why salt water was not used in completion of the well, replied:

"A. Because we had our mud already mixed with the low water loss and density we wanted, and chemical components, and so forth, and that was our procedure at that time. We just completed a well in this manner in the same field."

*Is Custom A Standard?*

We cannot believe, under the circumstances of this case, with its admitted dangers, that adopted procedures and the manner of completing previous wells by Pan American and other companies established a standard of care conclusively binding upon the jury. In Maize v. Atlantic Refining Co., supra, 41 A.2d at 853, it was emphasized that customary methods of conduct do not furnish a test which is conclusive or controlling on the question of negligence, or fix a standard by which negligence is to be gauged. Conformity to custom is not in itself the exercise of due care. An-

notation 68 A.L.R. 1400, 1401, and cases cited.

Custom may be evidence bearing upon the question of negligence, but the standard is not fixed by custom. The standard is always due care. The presence or absence of custom does not alter that standard. Custom may assist in the determination of what constitutes due care. What others do is some evidence of what should be done, but custom is never a substitute for due care. Pauly v. King, 44 Cal.2d 649, 284 P.2d 487, 490; Owen v. Rheem Mfg. Co., 83 Cal.App.2d 42, 187 P.2d 785, 786–787.

The same idea has been heretofore expressed for our court by Justice Harnsberger in Rocky Mountain Trucking Company v. Taylor, 79 Wyo. 461, 335 P.2d 448, 451, in these words:

"* * * An operational practice, although long indulged in, but which does not afford reasonable protection for those engaged in that operation, does not relieve from liability those responsible if it results in negligently causing injury or damage."

Having said custom is evidence but not a conclusive standard of due care, we would again pause to point out that we cannot pass upon the question as to whether the safety equipment and operational methods specified by Pan American were "adequate" and "proper" under the circumstances, nor whether it used every "reasonable" precaution suggested by experience and the known dangers. These, of course, are matters solely within the province of the jury.

### Was Verdict Excessive?

We confess the total sum awarded by the verdict in this case seems a very large figure. Attorneys connected with the case claim the verdict is the largest personal-injury verdict ever rendered in the State of Wyoming. On the other hand, if the verdict seems large, it must be noted that the injuries were exceedingly great. There would be no way to describe the injuries suffered by plaintiff in the explosion and fire except to say they were horrible in every sense of the word.

The jury did not award a single lump-sum total for damages. Instead, damages were assessed in the following amounts:

| | |
|---|---|
| For medical and hospital expenses | $11,748.95 |
| For disfigurement | $25,000.00 |
| For pain and suffering, past and future | $35,000.00 |
| For loss of earnings, past and future by reason of liability | $115,000.00 |

When the verdict is considered in its separate parts, item by item, it becomes apparent that there was ample evidence and a reasonable basis for each separate award which the jury made.

Counsel for appellant have submitted a brief in this court consisting of 137 pages. One page only was devoted to the matter of an excessive verdict. In that page they combined several items together and submitted that the recovery of $175,000 for disfigurement, pain and suffering and loss of earnings seems to be grossly excessive. No reasons were given for this claim, and no authorities were cited.

We must therefore follow the established rule that the amount to be assessed for damages suffered by a plaintiff as a result of personal injuries is within the sound discretion of the jury, unless the award is so excessive or unreasonable as to indicate passion or prejudice on the part of the jury. See Blakeman v. Gopp, Wyo., 364 P.2d 986, 991; and Chandler v. Dugan, 70 Wyo. 439, 251 P.2d 580, 587. We find nothing in the record in this case to indicate passion or prejudice and appellant cites nothing to show that it existed.

### Other Considerations and Conclusion

In the instant case we have carefully reviewed all parts of the arguments in both briefs. In doing so, we have noted and fully considered suggestions made on behalf of appellant-Pan American to the effect that

Like should be held guilty of contributory negligence as a matter of law; to the effect that Like should be construed to be an employee of Pan American and therefore limited to his benefits under Workmen's Compensation; to the effect that the trial judge should have allowed a request by defendant for special findings; and to the effect that certain instructions objected to by defendant should not have been given.

We find no reversible errors in connection with these matters, and we do not deem it necessary to discuss them in detail.

We have already indicated in our discussion above that we consider the verdict of the jury supported by substantial and sufficient evidence. Therefore, the case will be affirmed.

Affirmed.