DIAMOND MANAGEMENT CORPORA-TION, a Wyoming corporation, Appellant (Third-Party Plaintiff below),

v.

EMPIRE GAS CORPORATION, a Missouri corporation, and Wayne Maxson, Individually and as agent, servant and employee of Empire Gas Corporation, Appellees (Third-Party Defendants below).

No. 5036.

Supreme Court of Wyoming.

May 10, 1979.

Rehearing Denied June 7, 1979.

R. R. Bostwick and Patrick Dixon of Murane & Bostwick, Casper, for appellant.

Larry Lawton of Guy, Williams & White, Cheyenne, for appellees.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROONEY, Justice.

This is an appeal by third-party plaintiff (appellant) from a judgment in favor of third-party defendants (appellees) after a trial to the court on the issue of whether or not appellant should have contribution from appellees to satisfy a judgment of $1,646,-438.49 paid by appellant in settlement of a claim for damages caused by explosion of a propane (liquified petroleum gas) bottle. The propriety of contribution turned on whether or not appellees were negligent in the premises. The trial court found that they were not. We will affirm.

The litigation originally involved numerous other parties. Although appellant orig-inally based its action against appellees on additional theories, the trial was had only on the theory of contribution. For the purposes of this action, it was stipulated that appellant was liable to those injured, that it had settled the liability with them, and that the amount of the settlement was fair and reasonable.

Appellant operated a ranch near Dubois. It used a great deal of propane for heating of buildings, running irrigation pumps, burning weeds, and other ranching activities, including the heating of branding irons. Most, but not all, of the propane was purchased from appellee Empire Gas Corporation, also known as Empiregas, Inc. of Dubois [1] (hereinafter appellee Empire Gas). Appellee Empire Gas delivered some of the propane to a larger storage tank on the ranch, from which the propane could be transferred to smaller portable containers. Appellee Wayne Maxson, an employee of appellee Empire Gas, made the deliveries of the propane to appellant for appellee Empire Gas. On May 3, 1974, one of the ranch hands connected a bottle to the storage tank and left it overnight to be filled. The next day, another employee disconnected the bottle and took it to a branding corral where it was left in the sun. The sun's heat expanded the propane, creating hydrostatic pressure in excess of the burst capacity of the bottle, causing it to rupture. The resulting explosion and fire injured thirteen persons, one of whom died. Most bottles contain a "spit" or "pop-off" valve to vent excess pressure. This particular bottle did not.

Additional facts to determine the issues here presented will be set forth hereinafter as necessary.

Appellant alleges error: (1) in Findings of Fact 5, 6, 10, and 14, and Conclusions of Law 4, 6, 7, 9, 11, 12, and 13 made by the trial court in that they improperly applied the degree of duty owed by appellees; (2) in

1. The action was brought against Empire Gas Corporation, a Missouri corporation. Several other documents and record references characterize this third-party defendant as Empiregas, Inc. of Dubois. In answer to an interrogatory, Empire Gas Corporation stated that Empiregas, Inc. of Dubois was its wholly owned subsidiary.

Conclusions of Law 11, 12, and 13 in that fault was not properly proportioned; and (3) in refusing to admit a statement of a witness for purposes of impeachment on the grounds of attorney-client relationship.

### DEGREE OF DUTY OWED BY APPELLEES

The findings of fact and conclusions of law which appellant alleges to be in error in this respect are:

### "FINDINGS OF FACT

\*        \*        \*        \*        \*        \*

"5. The Third-Party Defendant, Maxson, did not know, nor was it reasonably apparent, who filled propane bottles at the 590 gallon tank or who was in charge of said tank.

"6. Discussions concerning safety in connection with the refilling operation of propane bottles and in connection with valves located on propane bottles had been discussed by the Third-Party Defendant, Maxson, with foremen and employees of Diamond Management Corporation.

\*        \*        \*        \*        \*        \*

"10. The Third-Party Defendant, Wayne Maxson, prior to the accident, recognized the hazardous condition of said bottle in that it lacked a safety relief device and Maxson had delivered a clear and adequate warning to employees of the Third-Party Plaintiff, particularly Clayton Cargill, of the hazardous conditon [sic] of said bottle and noted the lack of a pressure relief device.

\*        \*        \*        \*        \*        \*

"14. That said injuries and damages would not have occurred if the foremen and employees of Diamond Management Corporation had heeded the instructions and warning of the Third-Party Defendant, Maxson, and had received proper training, instruction and supervision from the Third-Party Plaintiff relative to the handling of LP gas.

### "CONCLUSIONS OF LAW

\*        \*        \*        \*        \*        \*

"4. That the warnings which Maxson had given the foreman [sic] and employees of Diamond Management Corporation fulfilled the duty of the Third-Party Defendants to warn of dangerous practices; and that said warnings were delivered to the foremen and employees of Diamond Management Corporation.

\*        \*        \*        \*        \*        \*

"6. That Diamond Management Corporation breached its duty in that it negligently failed to train, instruct and supervise its employees in the safe handling of LP gas, which duty is nondelegable.

"7. That the system for refilling small propane bottles from the larger propane tank was installed and operated by employees of Diamond Management Corporation, and neither Maxson nor Empire Gas are [sic] liable for any defects or deficiencies in said refilling system.

\*        \*        \*        \*        \*        \*

"9. Neither Wayne Maxson nor Empire Gas had a duty to prevent unsafe practices in the filling of said bottles *by means* of seizure of property of Diamond Management Corporation or bottles or tanks leased to Diamond Management Corporation.

\*        \*        \*        \*        \*        \*

"11. That neither Wayne Maxson nor Empire Gas Corporation is liable to Diamond Management Corporation as a joint tortfeasor.

"12. That neither Empire Gas nor Wayne Maxson is liable to Diamond Management Corporation on the Third-Party Complaint of Diamond Management Corporation.

"13. That neither Wayne Maxson nor Empire Gas Corporation were [sic] negligent."

On appeal, findings of fact are presumptively correct and shall not be set aside unless clearly erroneous or contrary to the great weight of the evidence. The standard for our review in this case was well stated

by Justice Rose in *Whitefoot v. Hanover Ins. Co.,* Wyo., 561 P.2d 717, 720 (1977):

"The trial court's revised findings of fact 'come here well armed with the buckler and shield' of presumed correctness. The findings and judgment of a trial court are generally affirmed if there is any evidence to support them (*Bentzen v. H. N. Ranch, Inc.,* 78 Wyo. 158, 320 P.2d 440) and should be disturbed only when it appears they are clearly erroneous or contrary to the great weight of evidence. *Willis v. Asbury Transportation Co.,* Wyo., 386 P.2d 934. An appellate court should not substitute its conclusions for those made by the lower court (*Twing v. Schott,* 80 Wyo. 100, 338 P.2d 839), particularly when a case is tried to a court without a jury and different conclusions can be rationally drawn from the evidence. *Arch Sellery, Inc. v. Simpson,* Wyo., 360 P.2d 911. Although the record does not reveal an overwhelming amount of support, sufficient evidence is presented to substantiate the trial court's revised findings of fact. They are neither clearly erroneous nor contrary to the great weight of the evidence and should be affirmed."

Appellant contends that the application of this standard will not support the findings to the effect that appellee Empire Gas' employee, appellee Maxson, exercised proper care, having regard to all of the circumstances involved, in warning employees of appellant relative to the hazardous condition of the bottle which exploded and in the handling of propane generally.

■ As stated in *Pan American Petroleum Corporation v. Like,* 381 P.2d 70, 74 (1963):

"It is generally the rule that a person knowingly dealing with a dangerous agency must exercise care commensurate with the danger of injury involved. In other words, he must exercise ordinary care, having regard to all of the circumstances involved. [Citations.]

"A higher degree of care is required in dealing with a dangerous agency than in the ordinary affairs of life or business which involve little or no risk. This care is sometimes described as a high degree of care, or a very high degree of care, or in some instances as the utmost care or extreme care. [Citations.]

"While no absolute standard of duty in dealing with dangerous agencies can be prescribed, it is safe to say in general terms that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken. [Citations.]"

The trial court determined that this standard of duty was met by appellees, and a review of the evidence reflects that the determination was not clearly erroneous or contrary to the great weight of the evidence.

Appellee Maxson testified that he discussed the methods and procedures of filling bottles from storage tanks and the necessity for leaving expansion space on top with appellant's employees "on more than one occasion." He specified discussions with appellant's employees, Clayton Cargill, John Raymond and Don Albright, the farm manager. He said George Meeks, the ranch manager, and "one or two other individuals were nearby" during some of the discussions. He testified that he told Cargill, who was a foreman of the equipment or maintenance men, that the bottles had to be weighed "on a set of scales to know what's in them;" and that he suggested that they use scales. He also testified that he noticed the bottle without a "pop-off" valve a few months before the incident as he drove by the ranch shop where it was standing with another bottle. At that time, he examined the bottle and told Cargill, who was the only one around, that a safety valve should be installed on the bottle and that if he "had to work with equipment like that, it would scare the hell out of me." He asked Cargill "if he would see to it" and that Cargill "acknowledged me." He said that he offered to put a safety valve on the bottle if it were brought to the office in Dubois. Cargill testified that he could not recall this conversation. Maxson said that he did not know which of appellant's em-

ployees was in charge of filling the bottles or who actually filled them.

Testimony of appellee Maxson and of appellant's expert, Robert F. Harrison, was to the effect that the explosion would not have occurred had the bottle been used as suggested by appellee Maxson, or if those using it had been properly instructed relative to use of scales, proper filling and the like. Testimony of all witnesses, except Harrison, but including William G. Pritchard, the principal officer of appellant, was to the effect that safety meetings were not held by appellant and that appellant had not furnished instruction or training in the handling of propane to its employees.

There was testimony that the bottles, including the one that exploded, and other propane receptacles and equipment on the ranch were the property of appellant; that appellant had instituted the method and practice of filling the bottles from the storage tank; that employees of appellant performed the filling operation; and that the employees did not receive instructions relative to the safety factors in the filling operation or relative to propane generally.

All in all, there was more than sufficient evidence for the court to make the findings of fact concerning which appellant complains and it cannot be said that a review of the entire evidence leaves us with the definite and firm conviction that a mistake has been committed.

"Although there is force to the observation that 'it is idle to try to define' what is meant by 'clearly erroneous,' the definition announced by the Supreme Court in 1948 has been reiterated many times by that Court and the courts of appeals and is the definitive test in reviewing findings: [footnote omitted.]

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. [*U. S. v. U. S. Gypsum Co.,* 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (per Reed, J.)]

"In determining whether a finding is clearly erroneous the rule requires that due regard be given to the opportunity of the trial court to judge the credibility of the witnesses. * * *" [footnote omitted.] 9 Wright & Miller, Federal Practice and Procedure: Civil § 2585, pp. 731–732.

But appellant carries its argument further. It contends that the trial court did not apply the facts to a proper degree of duty owed by appellees to those injured. It characterizes this duty as an "extreme duty." Without consideration of the difference, if any between a "duty" and "standard of care," it is sufficient for the purposes of this case to recognize that appellant's contention is that the standard of care imposed upon one who handles a potentially dangerous product is to use every reasonable precaution suggested by experience to avoid known dangers. Appellant properly cites *Pan American Petroleum Corporation v. Like,* supra, and *Murphy v. Petrolane-Wyoming Gas Service,* Wyo., 468 P.2d 969 (1970), among other cases, in support of this contention. The record reflects that this standard was adequately argued to the trial court. The first conclusion of law made by that court was "that propane is an inherently dangerous substance." There is nothing in the record to reflect that the trial court did not apply this standard. The judgment and the findings of fact do reflect that the trial court did not accept appellant's interpretation as to what was a "reasonable precaution" as "suggested by experience to avoid known dangers." As a trier of fact, it need not do so if the evidence concerning the facts is such that reasonable men may differ as to the results.

Appellant contends that appellees did not adequately (1) instruct all of the employees of appellant in the properties and use of propane; (2) warn them of the dangers in attaching the bottle to the tank overnight and in not weighing the bottles; (3) remove the pertinent bottle (which belonged to appellant) from appellant's premises, or tag it, or fix it, or refuse to sell propane to appellant which might be used in it; and (4) give a warning relative to

danger from use of the pertinent bottle. There was sufficient evidence upon which a reasonable determination could be made to the effect that appellees' actions in these respects were adequate, and it cannot be said that the findings were clearly erroneous. A careful review of the findings of fact and conclusions of law, taken as a whole, reflects that determination by the trial court that the instructions, warnings and actions of the appellees under the conditions and circumstances of this case amounted "to reasonable precautions suggested by experience to avoid known dangers" was not clearly erroneous or contrary to the great weight of the evidence. We cannot, therefore, make a contrary determination as a matter of law.

We emphasize that the particular facts of this case occasion the result since they give rise to the situation in which reasonable men might differ in determining whether or not a distributor of a potentially dangerous product had used "reasonable precaution." The widespread and varied use of propane by appellant; the ownership and operation of its own intra-organization distribution system; the testimony of Donald Albright and other employees of appellant that they recognized the dangerous nature of propane; the discussions by appellee Maxson with appellant's employees; and appellee Maxson's warning concerning the pertinent bottle make a situation in this case which is quite different from that which exists between the usual customer of a distributor and the distributor. The trial court's determination under the facts of this case was not clearly erroneous.

## PROPORTIONMENT OF FAULT

Since negligence of appellees does not exist, the premise on which proportionment is predicated fails, and we need not concern ourselves further with this allegation of error.

## REFUSAL TO ADMIT STATEMENT FOR IMPEACHMENT

■ To impeach a witness is to attack his credibility—to call into question his veracity. *State v. Tilley,* 239 N.C. 245, 79 S.E.2d 473 (1954); and *State v. Peterson,* Iowa, 219 N.W.2d 665, 671 (1974). One method of impeachment is to introduce evidence of prior inconsistent statements made by the witness. *State v. Peterson,* supra; and *United States v. Carter,* 3rd Cir. 1969, 417 F.2d 229, 230. Whether testimony of a witness is in fact inconsistent with his prior statement so as to constitute impeachment of the witness should be determined from his testimony as a whole and not from isolated answers. *O'Neill v. Minneapolis St. Ry. Co.,* 213 Minn. 214, 7 N.W.2d 665, 669 (1942).

■ The objection to the introduction of the prior statement in this case was on the grounds of attorney-client privilege, and the objection was sustained upon those grounds. The prior statement was telephonically made to attorneys for the employer of the witness and recorded on tape. The office manager, wife and daughter of witness were present when the statement was made. We need not determine whether or not the attorney-client privilege was a proper basis for excluding the prior statement inasmuch as the ruling would be harmless error even if improper. It would be harmless error because the excluded prior statement was not inconsistent with the testimony of the witness, taken as a whole, and it would be cumulative at best. *Huber v. Thomas,* 45 Wyo. 440, 19 P.2d 1042 (1933); and *Cronberg Bros. v. Johnson,* 29 Wyo. 11, 208 P. 446 (1922). Accordingly, the error, if any, would not be prejudicial to substantial rights of appellant. *Pure Gas and Chemical Company v. Cook,* Wyo., 526 P.2d 986 (1974); and *Day v. Smith,* 46 Wyo. 515, 30 P.2d 786 (1934).

The record basis for the foregoing is as follows. The witness, appellee Maxson, was called by the appellant to testify as an adverse party. He was on the witness stand for the entire first day of the trial. The excluded alleged contradictory statement, as reflected by the offer of proof, had to do with weighing of the bottles to determine whether or not they were full. The statement was:

"I'm sure they don't weigh them. I have never seen any scales around out there or anything or heard anybody mention the fact."

The statement concerns three items: (1) They do not weigh them; (2) I have not seen scales there; and (3) I have not heard anyone talk about weighing them. The last item might be taken to concern hearing anyone talk about scales there. But the first item concerned the pertinent question of whether or not the bottles were weighed, and it is probable that the second and third items were with reference to this first and pertinent item.

More than once the witness testified substantially to these three items. He testified as follows on direct by Mr. Bostwick:

"Q. Did you observe any scales there?

"A. No, sir, never.

"Q. At no time?

"A. No.

"Q. Scales would be necessary in order to weigh it, would they not?

"A. That's right.

"Q. And did you ever make an inquiry as to whether or not there were any scales?

"A. Yes, on two or three different occasions.

"Q. Of whom did you make that inquiry?

"A. Clayton Cargill and John Raymond.

＊　　＊　　＊　　＊　　＊　　＊

"Q. With this particular bottle, Exhibit 1, the only way you could tell would be to weigh it?

"A. With weights, right.

"Q. You never saw any scales near that location?

"A. No. All I did was inquire as to whether there were scales or some provisions for weighing this bottle. I was told that they had scales if they weighed feed or something and, as I understood, this would take care of it.

"Q. Where were those?

"A. I don't know.

"Q. From whom did you get that information?

"A. Clayton told me that they had scales somewhere in the shop or something he said, or in the shed or the shop or something, and more than one individual mentioned that they did have scales on the ranch that they could have used.

"Q. I see.

"A. They were some distance—

"Q. More than one individual?

"A. —from this area.

"Q. Can you name them?

"A. I asked Harold Albright once and he said they did, and I asked John Raymond and he said that they could use the same ones they weighed the calf feed and the calves on or something. And, as near as I know, a scales is a scales, it doesn't matter what configuration they come in."

On redirect by Mr. Bostwick:

"A. I told him that there had to be an expansion space in the top of these bottles for expansion. I said if you're not sure, blow it down, and in a safe area, and I explained to him how to tip it over, how to blow out some liquid fuel. Then I said you have got to weigh it on a set of scales to know what's in there.

"Q. Did you ask him at that time if he had scales?

"A. I believe that was the first time I knew about scales because I said you have to have a set of scales to weigh those things properly and tell what's in them.

＊　　＊　　＊　　＊　　＊　　＊

"Q. All right, now you indicated to me that you talked to Mr. Cargill, Mr. Raymond, and I believe Don Albright about scales?

"A. Yes."

At this point, the effort was made to impeach the witness through use of the alleged inconsistent statement.

Redirect continued by Mr. Bostwick:

"Q. Do you recall your deposition being taken on July 12, 1976 in Riverton?

"A. Yes, sir.

"Q. And the question of scales came up in the deposition?

"A. Yes.

"Q. I believe that examination was being conducted by Mr. Hursh?

"A. Yes.

"Q. And I'm referring to page 46 starting at line 15, and the question to you was this: 'Q: Do you know whether or not the Diamond had their own scales? A: I was told that they had scales in the large shop, which is only 200 feet or less from this area. Q: Who told you that? A: Clayton Cargill told me that, John Raymond told me that, Harold Albright told me that, Mary Lou Finley, who is a sister-in-law of Mrs. Cargill, told me that.'

"A. That is the understanding that I had was that the scales were in the shop.

"Q. All right, now you gave—those questions were asked and those answers were given?

"A. Yes.

"Q. Then there is a question at line 23: 'Q: Do you have any knowledge from anyone that the scales were used? A: They were not used. No one let me have any indication that they were used, and I personally did not ever see them being used.'

"A. That's correct.

"Q. Did you give that answer?

"A. Yes.

"MR. LAWTON: May we have the entire answer, counsel?

"MR. BOSTWICK: Yes, you may, but I'll answer it here as we get along. 'But I couldn't say that they weren't because they could have removed the bottles from the tank area, taken them to the scales and blown off the excess fuel, which would have been the only way to remove it if they were overfilled. If they were underfilled, no problem.' Did you give that answer?

"A. That's right, that's what I said.

"Q. (By Mr. Bostwick) Did you ever make any kind of an inquiry or an investigation further about the use of scales other than what you said in those questions?

"A. No, sir, I took their word for it.

"Q. Their word that they had them?

"A. Yes.

"Q. Did you ask them if they were being used?

"A. I just suggested that they do use them. Like I said in those, I understood that they hadn't been using them, so I suggested that they do use them if they didn't use anything more than a pair of household scales.

"Q. Did you ever check back and try to find out whether they did in fact use scales?

"A. No, I never followed up on it.

"Q. And as we said before, that's the only way that we could be sure or they could be sure as to whether or not they were underfilled or overfilled or properly filled on the bottle?

"A. On this particular—

"Q. This bottle?

"A. —yes, on this particular bottle.

"Q. Right.

"A. Because it has no outage valve.

"Q. Right. By outage valve, do you mean one that they turn it on and spill it out?

"A. Right. It would show them when the liquid level reached a certain point and they could discontinue the filling procedure."

There is nothing in this testimony inconsistent with the prior statement offered for impeachment that: (1) I'm sure they don't weigh them; (2) I have never seen any scales around out there or anything; or (3) [I have never] heard anybody mention the fact [that they weighed them].

Therefore, if the prior statement was improperly excluded, appellant was not prejudiced thereby, and the error was harmless.

The judgment is affirmed.