Harley F. ROLFE and Pauline G. Rolfe, Appellants (Defendants),

v.

John S. VARLEY, Jr., Appellee (Plaintiff).

No. 92–60.

Supreme Court of Wyoming.

Oct. 4, 1993.

Lawrence B. Hartnett, Jackson, for appellants.

Joseph F. Moore, argued and Glenn W. Myers of Moore & Myers, Jackson, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

CARDINE, Justice.

Harley and Pauline Rolfe, husband and wife, appeal from a judgment, awarding Jay Varley approximately $900,000.00, an equitable lien on all of the Rolfes' real estate holdings, and terminating the alleged partnership between the Rolfes and Varley. Underlying this controversy is a written document, signed by the parties, which was to formalize their agreement to develop a resort hotel facility in Jackson, Wyoming; but instead the agreement created a tangled web of rights and duties. After a four-day bench trial, the district court issued findings of fact and conclusions of law and a judgment in favor of Varley.

We affirm.

The Rolfes raise a number of issues:

ISSUE I. The trial court erred in finding from the facts of record in the action below and concluding as a matter of law that Appellant Pauline Rolfe was jointly and severally liable for any judgment against or obligation of her husband, Appellant Harley Rolfe, arising out of Appellant Harley Rolfe's relationship with the Appellee, Jay Varley the April 7, 1987 agreement.

ISSUE II. The court erred as a matter of law and of fact in awarding an equitable lien against the sole and separate property of Appellant Pauline Rolfe.

ISSUE III. The court erred as a matter of law in awarding an equitable lien against the property of Appellant Harley Rolfe.

ISSUE IV. The court erred as a matter of law in the manner in its construction and interpretation of the April 6, 1987 Agreement.

ISSUE V. The Appellee breached the partnership agreement by refusing to provide the means to satisfy the obligations set forth on Exhibit A to the

Agreement; by wrongfully dissolving the partnership prior to the completion of its stated purpose; and, by breaching his fiduciary duty to the Appellee Harley Rolfe in the conduct of the partnership purpose which caused the failure of the project.

ISSUE VI. The trial court erred by failing to award Appellant damages for Appellee's breach of contract and fiduciary duty.

ISSUE VII. The trial court erred as a matter of law in the manner in which it terminated the partnership.

## I. FACTS

Appellant, Harley Rolfe (Harley), moved to Jackson, Wyoming in 1976, where he purchased the Western Motel. Before moving to Jackson, Harley worked in sales and marketing for several large communications corporations. Harley has a masters degree in business administration, with a concentration in marketing.

In 1979, Harley married appellant, Pauline Rolfe. It was his second marriage. When Harley and Pauline married, they each owned real estate in Jackson. Harley held title to the Western Motel complex which included eight lots. Pauline owned four properties, also located in Jackson, which were leased to local business professionals.

Since purchasing the Western Motel, Harley had wanted to develop it into a resort complex. Before enlisting the help of appellee, John Varley (Varley), Harley had contact with three other groups or individuals concerning the potential development of his Western Motel property. One of those individuals, Gary Smith (Smith), an attorney from Kentucky, acted as an intermediary between Harley and potential investors in the proposed resort project. These individual investors would advance Harley money, in anticipation of forming a business relationship with Harley for the development of the Western Motel. Harley used the money advanced by these potential investors to service the growing debt he and Pauline had accrued on their properties.

Then along came appellee John Varley. He is from Chicago and has a masters degree in business administration. He worked as a mortgage banker and then became self-employed, managing his own properties in the Chicago area. Varley first contacted Harley and Pauline in 1983 when he stayed at the Western Motel during a ski vacation in Jackson. Harley and Varley met again in Jackson in 1985, and in 1987 they engaged in their first serious discussions about developing the Western Motel property. After their meeting in 1987, Harley and Varley corresponded by mail and phone. These meetings and contacts culminated in the drafting and signing of a document titled, *Agreement,* on April 6, 1987.

During negotiations for the *Agreement,* Smith was also present. Smith and Harley drafted the *Agreement* using Harley's typewriter. The document was drawn as an agreement between the Rolfes (Harley and Pauline) and Varley. The *Agreement* provided that the Rolfes and Varley would enter into another agreement forming a partnership within thirty days of the execution of the *Agreement.* The *Agreement* stated that the future partnership must include the following "rights and obligations of the parties": (1) Harley must contribute the Western Motel property to the partnership, and (2) Varley must "provide the means to satisfy all current and existing debts and obligations encumbering or relating to the [Western Motel] property." The *Agreement* also stated that Varley, "for the benefit of the partnership and proposed development, shall use his best effort to purchase six [6] lots" and that Varley will pay Harley and Pauline $10,000.00 for expenses already accrued. In addition, the *Agreement* described the possibility of a "wrap-mortgage" if Varley satisfied either part or all of the Western Motel debts; this section of the *Agreement,* however, was very ambiguous. The Rolfes and Varley never entered into the contemplated partnership agreement.

After the *Agreement* was signed, Harley and Varley vigorously pursued their dream of creating a resort complex on the Western Motel property. Using Varley's money, the parties hired a builder, an architect and several different consultants to assist in the development efforts. Originally, in 1987, the parties contemplated a $7,000,000.00 project; however, after several changes on advice from the consultants, the proposed cost of the project grew to an estimated cost of $30,000,000.00 in 1988. At this point, the project was in jeopardy, and the parties attempted to downsize the project to make it workable.

Over the two-year period, beginning in April of 1987 with the $10,000.00 described in the *Agreement* and ending in 1989 when the joint effort to develop collapsed, Varley advanced Harley and Pauline $397,316.45 for the payment of their debts on the Western Motel. During October 1989, after the $30,000,000.00 figure appeared and after attempts to downsize the project, Varley discontinued paying the Western Motel debts. Throughout this period of debt service by Varley, he made several demands from the Rolfes for a personal note and mortgage as security for the debt payments. The Rolfes, however, refused to execute a note and mortgage.

The debt, which the Rolfes had accrued on the Western Motel, was over $500,000.00. Several of these loans were secured, not only by the Western Motel property, but also by Pauline's property. When Varley signed the *Agreement,* it was his understanding that the payments he made for the Western Motel debt were to be secured by the same collateral as was securing the underlying debts.

In addition to the money Varley expended for servicing the Western Motel debt, he also spent $347,556.85 towards trying to develop the resort complex. These funds were payments made to the builder, the architect and the host of consultants the parties hired.

Finally, in September 1990, Varley filed this suit in district court. Following a four-day bench trial, the district court awarded judgment to Varley for his two years of Western Motel debt payment and for his expenditures in pursuit of the resort development. In addition, the district court granted Varley interest on those damages, an equitable lien on all of Harley's and Pauline's property, and terminated whatever formal relationship existed between the Rolfes and Varley. The Rolfes now appeal several aspects of the judgment and the district court's findings of fact and conclusions of law.

## II. DISCUSSION

### A. STANDARD OF REVIEW

 When reviewing civil judgments, accompanied by enumerated findings of fact and conclusions of law, this court affirms findings of fact unless proven to be clearly erroneous and reviews conclusions of law *de novo*. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo. 1993). To declare a finding clearly erroneous, the appeals court must be " 'left with the definite and firm conviction that a mistake has been committed.' " *Hopper*, at 538 (*quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Additionally, we defer to the trial court's assessment of witness credibility. *Hopper*, at 538 (*citing Shores v. Lindsey*, 591 P.2d 895, 899 (Wyo.1979)). In other words, when reviewing the record,

> we must assume that evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it.

*Zanetti v. Zanetti*, 689 P.2d 1116, 1120 (Wyo.1984).

### B. EQUITABLE LIEN

 The first three arguments raised by the Rolfes involve the same issue, whether the court erred in granting Varley an equitable lien against the properties of Pauline and Harley. In making this argument, the

Rolfes claim that the equitable lien placed on Pauline's and Harley's property was error because the equitable lien doctrine does not apply to these facts. Additionally, they argue that the equitable lien placed on Pauline's property is error because she was not jointly and severally liable under the *Agreement.*

 The equitable lien has been described generally as

a right, not recognized at law, which a court of equity recognizes and enforces as distinct from strictly legal rights, to have a fund or specific property, or the proceeds, applied in full or in part to the payment of a particular debt or demand.

53 C.J.S. *Liens* § 2 at 457 (1987). Equitable liens arise in two ways, either by a contract or by implication. Dan B. Dobbs, Law of Remedies § 4.3(3) at 401–02 (2nd ed. 1993); *see also* 53 C.J.S. *Liens* §§ 6 and 8 at 464, 467. An equitable lien created expressly by contract occurs where a contract states that certain property will act as security but for some reason or another it fails to create a lien enforceable at law and thus the court enforces it in equity. *Dobbs,* at 402; 53 C.J.S. *Liens* § 6 at 464. Where there is no contract, equitable liens are implied by courts to avoid unjust enrichment. *Dobbs,* at 402.

 Equitable liens are related to several other equity concepts. They are imposed to prevent unjust enrichment where the unjust enrichment might result from the "receipt of particular property." *United States Through Farmers Home Admin. v. Redland,* 695 P.2d 1031, 1040 (Wyo.1985). An equitable lien is said to be a "special, and limited, form of the constructive trust" and closely related to subrogation because each is a remedy used to prevent unjust enrichment or fraud, and to allow restitution. *Dobbs,* § 4.3(3) at 402, § 4.3(4) at 405; 53 C.J.S. *Liens* § 2(b) at 457, § 3(b) at 459.

 The following four requirements must exist before an equitable lien can be imposed:

(1) a duty or obligation from one person to another; (2) a res to which that obligation attaches; (3) which can be identified with reasonable certainty; and, (4) an intent that the property serve as security for that purpose.

*Redland,* 695 P.2d at 1040.

The district court did not err in imposing an equitable lien on both Pauline's and Harley's properties. Both Pauline and Harley signed the *Agreement* and accepted Varley's payments, thus they are obligated to Varley for his payments towards the Western Motel debt. Varley's payments went toward debts for which both Pauline and Harley were personally liable and which were secured by the Western Motel property. In addition, at least one of the debts was secured by Pauline's four properties. Thus, their obligation to Varley attaches to a recognizable res. The record demonstrates that the parties intended Pauline's and Harley's property to serve as security because the *Agreement* described a "wrap-mortgage" and because Varley testified that he understood that he would get a wrap-mortgage. Therefore, applying the four element test for an equitable lien, the district court ruled in accordance with law when it imposed an equitable lien on Pauline's and Harley's property for the debt payments made by Varley.

 There is further support for imposing an equitable lien. It is generally held that an equitable lien exists where one party has paid another party's liabilities or debts owed upon certain, identifiable property. The general rule is:

Where debts or claims against property are paid in good faith by another on the express or implied request of the owner of the property, the one so paying is entitled to an equitable lien on the property for his reimbursement. However, a person is not entitled to such lien if he voluntarily pays the debts of another without such other's request * * *. [footnotes omitted]

53 C.J.S. § 8(a) at 468; *see also Dobbs v. Bowling,* 339 So.2d 985 (Miss.1976) (equitable lien upheld because, where one party made another's mortgage payments, then the paying party is subrogated to the

rights of the mortgagee). In addition, where money advances are made by one party to another "under an agreement or circumstances showing that it was the intention of the parties to pledge [certain] property as security for the advancements," equitable liens have been imposed. 53 C.J.S. § 8(c) at 469, *see also Beck v. Brooks*, 224 Kan. 300, 580 P.2d 882, 884–85 (1978) (equitable mortgage imposed where one party advanced another money upon the faith of an agreement of a mortgage security but mortgage never executed).

■ We agree that Pauline was properly found to be jointly and severally liable for the debt to Varley. Although the Rolfes testified to the contrary, it is clear from the *Agreement* and through the Rolfes' course of business, that Pauline was involved in the development process. First, she signed the *Agreement* which named her as one of the parties who was to enter into the partnership. Second, Pauline endorsed most of the checks made out by Varley to the Rolfes for Western Motel debt payments, and Pauline's testimony demonstrated that her finances and property management were heavily co-mingled with Harley's. Third, there is evidence, in a brochure created for potential investors, that Pauline was to be an integral part of the development. The brochure stated: "the principal(s) of the Managing General Partner will be Harley F. Rolfe and Pauline ____. Rolfe, his wife * * *."

The Rolfes' reliance on the case of *Reynolds v. Tice* is misplaced. In that case, the wife was held not liable under a contract in which she was named and which she signed because there was an addendum to the contract limiting her signature to release of her homestead and dower rights. *Reynolds v. Tice*, 595 P.2d 1318, 1320 (Wyo. 1979). In this case, Pauline was named as a party, and she signed the *Agreement* without any limiting language or ambiguity.

The *Agreement* and the testimony of the parties clearly demonstrates that Harley and Pauline requested Varley to pay their Western Motel debts and that Varley did pay those debts for a period of two years. Both Pauline's and Harley's properties were pledged as security for the underlying debts, and they both were personally liable; hence, both of their properties benefitted from Varley's payments. The district court, therefore, did not err in imposing an equitable lien on the Rolfes' property.

## C. THE "AGREEMENT"

The Rolfes' next group of arguments concern how the district court interpreted and enforced the *Agreement* of April 6, 1987. They argue that the district court interpreted the *Agreement* improperly; that the district court erred in not finding that Varley had breached the terms of the *Agreement* and by not awarding damages for that breach; and that the district court erred in terminating the partnership.

### 1. Construction of the "Agreement"

■ In its findings of fact and conclusions of law, the district court concluded that the *Agreement* was a "contract which * * * created a debtor/creditor relationship between Plaintiff Varley (creditor) and Defendants Rolfe (debtors)." The Rolfes argue that this conclusion is error, and they appear to argue that the *Agreement* instead created a partnership to which the Western Motel property was pledged and from which Varley was to receive the note and mortgage.

■ At the core of contract interpretation is the notion that the intent of the parties is the primary focus. *Jackson Hole Racquet Club Resort v. Teton Pines Ltd. Partnership*, 839 P.2d 951, 958 (Wyo.1992). Where the contract is unambiguous, extrinsic evidence is unnecessary and impermissible. If a contract is ambiguous, courts may use extrinsic evidence to discern the parties' intent. *Ferguson v. Reed*, 822 P.2d 1287, 1289 (Wyo.1991). A contract is ambiguous where it "is obscure in its meaning because of its indefiniteness of expression or because it contains a double meaning." *Id.* at 1289.

The essential portions of the *Agreement* are as follows:

This AGREEMENT, entered into on this 6th day of April, 1987 by and between HARLEY F. ROLFE, PAULINE G. ROLFE, his wife [collectively "ROLFE"], 375 E. Gill St., Jackson, WY 83001 and JOHN S. VARLEY. Jr., 835 W. Belden Ave., Chicago, IL 60614.

\* \* \* \* \* \*

Whereas VARLEY now desires to enter into a partnership with Rolfe for the purpose of syndicating and/or developing the property, together with acquiring additional real property, and it is the intent of ROLFE and VARLEY to enter into this initial agreement to expressly provide for the basic terms of their partnership and for consolidation and satisfaction of all prior obligations of ROLFE.

Now THEREFORE, in and for mutual consideration of the covenants and conditions set forth herein, the parties agree as follows:

1. That the parties will, within 30 days of the execution of this AGREEMENT, enter into a general partnership agreement and that said entity will provide for all rights and obligations of the parties together with the functions of the partnership which shall include but not be limited to the following:

a. That ROLFE shall contribute the property to the partnership together with any and all services relating to the syndication and development of the proposed facility.

b. That VARLEY shall provide the means to satisfy all current and existing debts and obligations encumbering or relating to the property, said list of debts and obligations being attached hereto attached as Exhibit "A"; and shall provide any and all required services necessary for the purpose and intent of the general partnership in syndicating and developing the proposed facility.

In the event that VARLEY should satisfy all or part through a wrap-mortgage, he shall be entitled to apply an interest rate of 3% over the prime rate that is charged by the Harris Bank and Trust of Chicago [Illinois], but not to exceed 13% or be less than 9% and to be accrued to the due date of the wrap-mortgage which shall be October 1, 1988 or no later than the first construction draw.

Both Harley and Varley testified that they believed that the above *Agreement* formed a partnership to develop the Western Motel property. The language of the first quoted paragraph clearly shows that the parties intended to form a development partnership; however, the language which follows in paragraph number 1, states that the *Agreement* is an agreement to enter into a partnership at a later date. Therefore, based upon the plain language of the document, the partnership contemplated by the *Agreement* was not formed on April 6, 1987, when the document was signed; instead the parties entered into a contract in which they mutually promised to form a partnership in thirty days. Yet, the district court specifically found that the parties had formed an entity which was either a partnership or a joint venture.

 Despite the plain language of the *Agreement,* a partnership was formed because the parties intended to create one. Whether or not a partnership has been created is controlled by the parties' intent. *Murphy v. Stevens,* 645 P.2d 82, 85 (Wyo. 1982). From both Varley's and Harley's testimony, it is apparent that they thought they had created a partnership and were acting as partners. That is sufficient to support the district court's finding that a partnership or joint venture was created. However, the entity which was formed was not the partnership contemplated in paragraph number 1 of the *Agreement,* but a partnership or joint venture to develop the Western Motel property as evidenced by the parties' actions.

 The question of whether the *Agreement* also created a creditor/debtor relationship is unclear. The language used in paragraph 1(b) of the *Agreement* is indefinite in its meaning. Hence, we must resort

to the rules of construction and extrinsic evidence.

As a starting point, we note that where a contract is ambiguous, it will be construed "most strongly against" the scrivener. *Kelliher v. Herman*, 701 P.2d 1157, 1159 n. 1 (Wyo.1985). In addition, when construing an ambiguous contract, we must consider "common sense and good faith" and interpret "[t]he words and acts of the parties * * * in accordance with the meaning which they would convey to reasonable men at the time and place of their use or commission." *Wangler v. Federer*, 714 P.2d 1209, 1213 (Wyo.1986).

We conclude, as did the district court, that the *Agreement* created a creditor/debtor relationship between the parties with respect to the payments of Rolfes' debts upon the Western Motel and a partnership or joint venture to develop the Western Motel into a resort hotel. We do so because: (1) the *Agreement* was drafted by Harley and Smith—the Kentucky attorney assisting the Rolfes—, (2) the use of the term *wrap-mortgage*, and (3) because it is the most reasonable interpretation.

A *wrap-mortgage* or *wraparound mortgage* is a transaction which involves:

"a second mortgage securing a promissory note, the face amount of which is the sum of the existing first mortgage liability plus the cash or equity advanced by the lender. The wrap-around borrower must make payments on the first mortgage debt to the wrap-around lender, who, as required by the wrap-around agreement, must in turn make payments on the first mortgage debt to the third party, the first mortgagee."

Grant S. Nelson and Dale A. Whitman, Real Estate Finance Law § 5.16 at 297 (2d ed. 1985) (*quoting* Comment, *The Wrap–Around Mortgage: A Critical Inquiry*, 21 U.C.L.A.L.Rev. 1529, 1529–30 (1974)). Clearly, the use of the term *wrap-mortgage* implies the creation of a creditor/debtor relationship. The Rolfes argue that paragraph 1(b) does not refer to them or to a promissory note, and thus they were not required by the agreement to execute a note and mortgage for the payments Varley made toward the Western Motel debt. However, the use of the term *wrap-mortgage* implies that a note was intended. The *Agreement* is clear in stating that Varley is to provide the means to satisfy all obligations on the Western motel property, all of which are personal obligations of the Rolfes. In addition, Varley testified that he believed, when the *Agreement* was signed, that the security for his debt service for the Rolfes would be the same as the underlying creditors he was paying off.

We think the only reasonable interpretation of this agreement is that it did create a creditor/debtor relationship between Varley and the Rolfes. Under the circumstances, common sense tells us that Varley wanted security, in the form of a wraparound mortgage from the Rolfes, in return for taking on the motel obligations. Therefore, we affirm the district court's conclusion that the *Agreement* created a creditor/debtor relationship.

### 2. Breach of the Agreement

In their next claim of error, the Rolfes assert that Varley breached the *Agreement* by wrongfully dissolving the partnership and by failing to continue to satisfy the Western Motel debts. Additionally, they argue that Varley breached his fiduciary duty under the partnership and that the district court should have awarded damages for these breaches.

The Rolfes argue that Varley's actions—discontinuing to pay down the Western Motel debts and refusing to complete the development project—contravened the stated purpose of the *Agreement* and thus caused a wrongful dissolution of the partnership under W.S. 17–13–603(a)(ii) (1989), which provides:

(a) Dissolution is caused:

\* \* \* \* \* \*

(ii) In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time[.]

The stated purpose of the *Agreement* was "to expressly provide for the basic terms of their partnership and for consolidation and satisfaction of all prior obligations of ROLFE [Pauline and Harley]." The trial court held that the *Agreement* created a creditor/debtor relationship and a partnership to develop the Western Motel property. Failing to complete the development under the circumstances presented here, and where the cost had escalated from $7,000,000.00 to $30,000,000.00, far beyond what the parties contemplated, was not a breach of the *Agreement* and not the cause of wrongful dissolution.

Concerning the Rolfes' initial argument that Varley breached the *Agreement* by refusing to continue to pay down the Western Motel debts, we find no further mention of this claim in the text of the Rolfes' brief nor any legal citation or argument. Therefore, we will not consider the claim because it is not supported by cogent argument. *Weisbrod v. Ely*, 767 P.2d 171, 176 (Wyo.1989). We note, however, that Varley discontinued the debt service on the Rolfes' debts only after the Rolfes had refused to execute a note and mortgage.

In their claim that Varley breached his fiduciary duty as a partner to the Rolfes, the Rolfes simply cite to us a couple of law review articles which "comprehensively discuss the fiduciary relation of partners." Nowhere in their argument do they state what the fiduciary duty of a partner entails. They appear to argue that delays, which Varley allegedly caused, amounted to a breach of his fiduciary duty because Varley knew that time was important to the Rolfes. After reviewing the law review articles cited to us and the record, we conclude that the district court's finding that there was no breach of fiduciary duty was not clearly erroneous.

Since we affirm the district court's findings of no breach of the *Agreement* and no breach of fiduciary duty, we need not address the question of damages on those claims.

## D. TERMINATION OF THE PARTNERSHIP

In their final argument, the Rolfes assert that the district court erred in how it terminated the partnership. The essence of this claim is that the district court did not properly distribute partnership assets nor did it determine the partnership liabilities, as required by the Wyoming Partnership Act. The Rolfes argue that the district court should have found that the Western Motel property and the six lots adjacent to the Motel, which Varley purchased, were partnership property. In addition, they argue that the district court should have ordered these partnership properties sold and applied to the partnership debts.

The district court made no finding as to the partnership property because the partnership, contemplated by the *Agreement* and to which the parties were to contribute certain property, was never formed as intended and the property was never conveyed by either party to any partnership. Therefore, title to the Western Motel property and Varley's six adjacent lots were continuously held by each respectively, not made partnership property, and not subject to liquidation to pay partnership debts.

As to the partnership liabilities, the record clearly establishes that Varley fronted the $347,000.00 for development purposes. The record also clearly demonstrates that Harley agreed each time to the expenditure of this money. The district court properly found these funds to be capital contributions to the partnership/joint venture and properly found each partner, the Rolfes and Varley, equally liable for payment of that partnership debt.

## III. CONCLUSION

We affirm the district court's judgment and findings of fact and conclusions of law. The district court properly invoked its equitable authority by imposing an equitable lien on the Rolfes' property. The written contract was ambiguous. The district court had no choice but to invoke equity in

resolving the dispute between these parties.

Affirmed.