Betty Joann FURMAN, as the personal representative of the Estate of Howard G. Furman, deceased, Appellant (Plaintiff),

v.

RURAL ELECTRIC COMPANY, a Wyoming corporation, Appellee (Defendant).

No. 93–13.

Supreme Court of Wyoming.

Feb. 18, 1994.

Jack Gage and Robert T. Moxley, Cheyenne, for appellant.

Bruce A. Salzburg of Herschler, Freudenthal, Salzburg, Bonds & Rideout, P.C., Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

GOLDEN, Justice.

This appeal arises from a wrongful death suit against appellee Rural Electric Company (REC). Appellant Betty Joann Furman (Furman) alleged negligent construction and maintenance of a high voltage power line caused the death of her son Howard Furman (decedent). Decedent was electrocuted when the aluminum surveying rod he was using contacted a high voltage power line. The jury returned a verdict finding REC zero percent at fault. Furman appeals, asserting that the trial court erred by admitting a toxicology report showing that decedent used marijuana and in instructing the jury.

We affirm.

Appellant states the issues as:

I. Was it an error of law or abuse of discretion to admit legally unreliable defense testimony which falsely implied that the decedent was under the influence of marijuana and amphetamines at the time of the incident leading to his death?

II. Was it an error of law to instruct the jury that the decedent's employer under the circumstances of the case had a duty to prevent the incident which took decedent's life?

III. Was it an error of law for the trial court to refuse jury instructions, tendered by the plaintiff, which defined the defendant's duty of care as a higher duty, commensurate with the ultrahazardous activity involved?

IV. Were the jury instructions cumulatively unfair, prejudicial to the plaintiff, and erroneous, which minimized the defendant's duty and over-emphasized the decedent's duty for self-preservation?

## FACTS

■ Initially, we address appellant's violations of our rules of appellate procedure and determine whether appellant's case can be reviewed by this court. *See State, Game & Fish Comm'n v. Thornock,* 851 P.2d 1300, 1304 (Wyo.1993). Appellant's first violation was a brief submitted by counsel which did not contain a statement of facts. The Wyoming Rules of Appellate Procedure require that the brief of appellant shall contain "a statement of the facts relevant to the issues presented for review with appropriate references to documents listed in the index of the

transmitted record." WYO.R.APP.P. 7.01(e)(2). A failure to comply with the rules of appellate procedure is ground for such action as this court deems appropriate, "including but not limited to: citation of counsel or a party for contempt; refusal to consider the offending party's contentions; assessment of costs; dismissal; or affirmance." WYO.R.APP.P. 1.03.

■ Counsel is admonished to comply with appellate rules; however, the facts in this record are straightforward and appellant's violation of the rules did not detract from our review. We therefore have proceeded to consider appellant's issues. *Thornock,* 851 P.2d at 1304.

■ Appellant's second violation was a reply brief submitted by counsel which repeated its principal brief. A reply brief is "limited to those new issues and arguments raised by the brief of appellee." WYO. R.APP.P. 7.03. Because appellant's reply brief stated that it would "emphasize again" and "reexamine," it was disregarded by this court.

On August 13, 1990, Howard Furman (decedent) was electrocuted when an aluminum survey rod he was handling contacted a high voltage power line owned by REC. The decedent was working as part of a summer survey crew for the Wyoming Highway Department (Highway Department). On the morning of his death, the decedent's crew was surveying near the intersection of Campstool Road and Interstate 80, about five miles east of Cheyenne, Wyoming. Decedent was to mark survey monuments with a twenty-five foot, telescoping aluminum rod with a prism placed on top, while the rest of the crew would aim a geodimeter at the elevated prism and record its location. The twenty-five foot rod was necessary because the other crew members' view of the monuments was blocked by a difference in elevation and an intervening highway overpass. After marking and recording the location of one monument, the decedent, working alone, moved to a second monument which was located underneath a 7,200 volt power line.

At this second monument, the decedent somehow contacted the power line with the extended prism pole. No one witnessed the accident. The crew went to the decedent only after being unable to contact him on their two-way radios. When they arrived, they found the decedent lying in the field next to the monument.

A warning sticker on the aluminum rod stated that it was not to be used during electrical storms or near electrical lines. The decedent had demonstrated an awareness of the danger presented by use of the rod because he had previously refused to use it during a threatening thunderstorm. Decedent had been trained about other existing methods which could have been used to locate this monument and did not require use of the aluminum pole. Also, the Highway Department's safety policy required certain safety measures before use of the rod around electrical power sources.

The monument and the REC-owned power lines above it were located next to the entrance to eastbound Interstate 80 from Campstool Road but were on the outside of the Interstate's control-of-access fence. REC's power line was, at the time and place of contact, somewhere between eighteen feet, one and one-half inches and eighteen feet, two and one-quarter inches above the ground. Because the pole was dismantled after decedent was found and, before measurement of its length at the time of the accident, an investigator reconstructed the pole's length based upon burn marks. The burn marks indicated that the pole's length at the time of contact was twenty feet, seven inches.

The National Electric Safety Code (NESC) is a document created to establish national standards for the construction, installation and maintenance of electricity. WYO.STAT. § 37-3-114 (1988) requires the Public Service Commission to "adopt * * * the provisions of the current edition of the National Electric Safety Code * * *." It was undisputed that the 1973 edition of the NESC applied to these wires and that this 7,200 volt line was hanging one foot below the 1973 NESC minimum clearance standard of nineteen feet. REC's expert testified that even if the wire had been at the 1973 NESC height of nineteen feet, the rod and prism, being

extended to twenty feet, seven inches, would still have contacted the wire.

REC's chief engineer testified concerning the actual installation of the wire contacted by the decedent. He stated that the installation designs called for the wire to clear the ground by twenty-three feet. He could not state why the wire was five feet below that design height at the time decedent contacted it, although he gave three possible explanations, including improper installation. If the line had been installed at the height of twenty-three feet as designed, decedent's survey rod, which was extended to a height of twenty feet and seven inches at the time of the accident, would not have come in contact with the power line.

An autopsy performed on the decedent revealed the presence of cannabinoids, the active ingredients in marijuana, and phenylpropanolamine, a stimulant found in over-the-counter cold medicines. The autopsy and toxicology report did not reveal when the decedent had been exposed to marijuana or how he was exposed to it. This information was admitted into evidence over Furman's objection.

On October 29, 1992, a jury returned a verdict finding REC zero percent at fault, attributing thirty percent of the fault to decedent and seventy percent to the Highway Department. Furman appeals from this verdict.

### DISCUSSION

A. *Admissibility of Toxicologist's Report*

Furman contends that the district court abused its discretion when it admitted a toxicology report which offered little probative value and was substantially outweighed by its unfair prejudicial effect. Furman also contends there was inadequate foundation for the admission of the report.

The report was performed as part of decedent's autopsy and showed the presence of amphetamines and cannabinoids (marijuana) in the decedent's urine at the time of his death. The admitted evidence included the toxicology report and testimony from a Cheyenne pathologist describing the amphetamine class as actually phenylpropanolamine,

a common cold medicine ingredient found in Dimetapp. Cross-examination revealed that the pathologist could only determine the drugs were present, but could not state an opinion whether decedent was under the influence of either at the time of his death.

Questions of admissibility of evidence are within the sound discretion of the trial court, and its decisions will not be overturned absent a clear abuse of discretion. *Buckles v. State*, 830 P.2d 702, 705 (Wyo. 1992). The trial court did not abuse its discretion in this case because the toxicology report was relevant as a possible explanation of why decedent raised the pole into the high voltage line. Evidence is relevant if it tends to make any fact of consequence more or less probable than it would be without that evidence. WYO.R.EVID. 401; *Buckles*, 830 P.2d at 706. All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible. WYO.R.EVID. 402; *Buckles*, 830 P.2d at 706.

The issue was why decedent disregarded his own knowledge, training, and the warning on the pole and raised it into the high voltage line. Furman had offered an explanation through the testimony of a "human factors engineer" expert in her case in chief. The expert testified that among several possible explanations it was most likely that decedent believed he could safely raise the pole and clear the line. The expert further testified decedent's belief was probably based on safely raising the pole in the past and the human eye's limitation on judging the distance of a power line.

REC countered the expert's testimony with the toxicology test and asserts that the evidence of phenylpropanolamine and marijuana use was as probative of the reason for Furman's conduct as that presented by Furman's expert and has the additional benefit of a factual basis. The district court based its admission of the toxicology report upon *Buckles*. There, this court held that the trial court had abused its discretion in excluding evidence that the victim of an alleged vehicular homicide had been found to have metabol-

ites of cocaine in his urine. We found the evidence relevant for two reasons. It was relevant to a conclusion whether or not the state had proved the cause of death beyond a reasonable doubt, and it was relevant to a conclusion whether or not the defendant had caused the death as charged. *Buckles,* 830 P.2d at 705. In this case, we agree the toxicology report evidence was relevant to support REC's theory that decedent's conduct was consistent with impairment of his faculties. This premise could lead to the conclusion that it was decedent's negligence which caused his death.

The evidence was not unfairly prejudicial. WYO.R.EVID. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

■ Furman appeals a jury verdict which found REC blameless. This evidence bears only upon the conduct of decedent and his negligence. The trial court did not abuse its discretion. Furman also asserts

that [REC] did not lay adequate foundation for the admission of the actual test results. That is, the expert witness gave an opinion relating to the significance of the tests. The expert did not, and could not, opine about the chain of evidence or accuracy of the tests.

This statement, however, is the only reference to the alleged foundational error, and it is not accompanied by any legal authority. This cursory statement does not amount to cogent argument. We decline, therefore, to consider Furman's claim that the toxicology evidence lacked foundation. *Rolfe v. Varley,* 860 P.2d 1152, 1161 (Wyo.1993).

## B. *Instructions*

Furman raises several objections concerning the trial court's instructions to the jury. First, she claims that the trial court erred by rejecting her offered instructions and by accepting REC's offered instructions on the question of each party's duty of care. Second, Furman argues that the trial court erred when it instructed the jury regarding the Highway Department's duties.

■ When reviewing jury instructions for error, we look at the instructions "as a whole and in the context of the entire trial" and determine if the alleged erroneous instruction "fairly and adequately presents the issues for the jury's consideration." *Seaton v. Wyo. Highway Comm'n Dist. No. 1,* 784 P.2d 197, 206 (Wyo.1989). In order to find reversible error in a trial court's instructions to the jury, Furman must demonstrate prejudice in the form of proof that the instruction confused or misled the jury with respect to the proper principles of law. *DeJulio v. Foster,* 715 P.2d 182, 186 (Wyo.1986).

### 1. *Instructions on Duty of Care*

#### *Decedent's Duty*

Furman first challenges Instruction No. 11 as overstating decedent's duty of care. The instruction provided:

In this case, Rural Electric Company contends that Howard Furman was negligent in raising the pole while standing beneath the power line, and that this negligence was the proximate cause of his death. You are instructed that Howard Furman had a duty to act reasonably to assure his own safety, given the situation in which he found himself, including keeping a "proper lookout." By a "proper lookout" is meant that the lookout which would be maintained by an ordinarily careful person in light of all present conditions.

"Proper lookout" includes a duty to see objects in plain sight and a person is bound to see reasonably that which is open and apparent and he must take knowledge of obvious dangers. This duty is not one of merely looking, but of observing which imposes on a person the necessity of being observant as to the conditions which exist in the general situation.

Furman argues that the trial court should have given her proffered instruction based on *Gish v. Colson,* 475 P.2d 717 (Wyo.1970), instead of this instruction. In *Gish,* this court determined that a decedent is presumed to have exercised ordinary care if

there is no eyewitness or other sufficient evidence to rebut that evidence. Furman proposed instructing the jury that decedent was presumed to have exercised reasonable care. In rejecting Furman's proposed instruction, the trial court stated that the presumption was not applicable because there was sufficient evidence for the jury to determine whether decedent used ordinary care.

This court recognizes that failure to comprehend and recognize danger may in itself constitute negligence. *Ely v. Kirk*, 707 P.2d 706, 710 (Wyo.1985); *Brittain v. Booth*, 601 P.2d 532, 535 (Wyo.1979). The evidence indicates decedent was aware that he should not use the pole in the vicinity of power lines and that the pole itself carried a warning against such use. Furman's own expert rendered the opinion that decedent was aware of the danger of using the pole in the vicinity of power lines and, knowing the danger, raised the pole because he thought the pole would clear the lines. Furman's own evidence was sufficient to permit the jury to determine if decedent exercised ordinary care when decedent extended a pole he knew conducted electricity and raised it under a power line. Under the facts of this case, Furman's offered instruction would have been error.

*REC's Duty*

Furman next asserts the trial court's instructions Nos. 4, 5, 14, and 15 incorrectly stated REC's duty of care because they failed to state that REC was engaged in an extrahazardous activity and, thus, had to exercise "utmost care." Furman asserts that the trial court's error in determining the proper standard of care then caused Instruction No. 18 to be in error. For both of these arguments, Furman relies on *Ruhs v. Pac. Power & Light*, 671 F.2d 1268 (10th Cir. 1982), interpreting this court's decision in *Pan Am. Petroleum Corp. v. Like*, 381 P.2d 70 (Wyo.1963) as authority for the higher standard of care.

The subject instructions read as follows:

### INSTRUCTION NO. 4

Defendant Rural Electric Company had a duty toward [decedent] to exercise due care in the design, installation and maintenance of its lines, to avoid undue risk of harm to him.

### INSTRUCTION NO. 5

When the word negligence is used in these instructions, it means the failure to use ordinary care. Ordinary care means the degree of care which might reasonably be expected of the ordinary careful person under the same or similar circumstances. The law does not say how such an ordinary careful person would act. That is for you to decide.

### INSTRUCTION NO. 14

Each utility shall construct, install, operate and maintain its plant, including structure, equipment and lines, in accordance with accepted good engineering practice.

### INSTRUCTION NO. 15

When electrical lines and equipment are put into service, they shall comply with the safety rules of the National Electrical Safety Code. Electrical lines shall be inspected at such intervals as experience is shown to be necessary. Lines and equipment with recorded defects which could reasonably be expected to endanger life or property shall be promptly repaired, disconnected or isolated.

### INSTRUCTION NO. 18

In the design, construction and maintenance of its power lines, Rural Electric Company's duty was to do so in consideration of the reasonably foreseeable activities which would occur beneath the power lines. A failure to anticipate and guard against a happening which would not have arisen but for exceptional or unusual circumstances is not negligence, nor does the law require those maintaining power transmission lines to anticipate every possible circumstance that might cause injurious contacts with those lines.

If you should find that Rural Electric Company was negligent in the design, construction or maintenance of the power line

in question, that negligence is not the proximate cause of the injury unless, under all the circumstances, the injury might have been reasonably foreseen.

The trial court rejected Furman's proposed instructions asserting the higher standard because there was no Wyoming case law to support the requested instructions, and the other included instructions adequately covered the fact that electricity is a dangerous instrumentality. This court has recently held that a jury should not be instructed there is a higher degree of care when a dangerous instrumentality is involved. *Wyrulec Co. v. Schutt,* 866 P.2d 756, 762 (Wyo. 1993).

We confirmed in *Wyrulec* that the *Ruhs* case did not hold there was a higher duty of care for a dangerous instrumentality. We also confirmed that the *Pan American* case was properly interpreted as stating the standard of care is ordinary care under all of the circumstances, regardless of whether a dangerous instrumentality is involved. It is not necessary to have degrees of care because the legal standard remains constant. However, what constitutes ordinary care increases as the danger increases. *Wyrulec,* 866 P.2d at 761–62. All of these instructions properly instructed the jury on the law.

### 2. *Instructions Concerning Decedent's Employer*

Furman next asserts that the instructions given concerning the Highway Department's duty of care are not supported by law. Furman did not object to these instructions as required by Wyo.R.Civ.P. 51; therefore, we review these instructions for plain error only. *Hashimoto v. Marathon Pipe Line Co.,* 767 P.2d 158, 163 (Wyo.1989). Furman asserts that the instructions given concerning the Highway Department's duties are not supported by law and that the trial court should have instructed the jury concerning the Highway Department's immunity from suit.

 Instruction No. 16 described a highway department policy concerning its employees working near high voltage lines and Instruction No. 17 described certain rules and regulations imposed by the Wyoming

Occupational Safety Commission. Furman's sole argument is that the policy described in Instruction No. 16 comes from the Wyoming High Voltage Power Lines and Safety Restrictions Act (High Voltage Act) which, she argues, does not apply to the Highway Department. This argument fails to demonstrate how the giving of these instructions amounts to clear violation of a clear rule of law which adversely affects her substantial rights. *See, Goggins v. Harwood,* 704 P.2d 1282, 1291 (Wyo.1985). The safety policy described in Instruction No. 16 applied to the Highway Department because it was self-imposed and in place before Furman's accident, not because the High Voltage Act required compliance.

 Lastly, Furman asserts that the trial court erred in failing to instruct the jury on the effect of the verdict form. She claims the verdict form should have indicated that the decedent's employer was immune from suit. Again, because Furman failed to properly object, we search only for plain error. *Goggins,* 704 P.2d at 1291. Wyo.Stat. § 1–1–109(b)(i)(B) (1988) provides:

(i) The court may, and when requested by any party shall:

\* \* \* \* \* \*

(B) Inform the jury of the consequences of its determination of the percentage of fault.

The trial court gave an instruction describing Wyoming' comparative fault scheme and alerting the jury that if it found decedent over fifty percent at fault then Furman will recover nothing. We recently found a similar instruction adequate for compliance with Wyo.Stat. § 1–1–109(b)(i)(B). *Haderlie v. Sondgeroth,* 866 P.2d 703 (Wyo.1993). Therefore, we find no plain error by the trial court in failing to inform the jury that the Highway Department was immune from suit.

### CONCLUSION

The trial court's admission of the toxicology report was not error. The trial court correctly rejected an instruction to the jury that decedent was presumed to have exercised ordinary care and correctly instructed on the proper standard of care for those

dealing with high voltage electric wires. We affirm the jury verdict.

CARDINE, Justice, dissenting.

Betty Joann Furman (Furman) sued the Rural Electric Company (REC) for wrongful death of her son Howard Furman (decedent), alleging negligent construction and maintenance of a high voltage power line. Decedent was killed when the aluminum surveying rod he was using contacted a high voltage power line. The jury returned a verdict finding REC 0% at fault; Furman appeals, asserting that the trial court erred by admitting a toxicology report showing that decedent used marijuana and in instructing the jury.

I would reverse.

Furman raises the following issues:

I. Was it an error of law or abuse of discretion to admit legally unreliable defense testimony which falsely implied that the decedent was under the influence of marijuana and amphetamines at the time of the incident leading to his death?

II. Was it an error of law to instruct the jury that the decedent's employer under the circumstances of the case had a duty to prevent the incident which took decedent's life?

III. Was it an error of law for the trial court to refuse jury instructions, tendered by the plaintiff, which defined the defendant's duty of care as a higher duty, commensurate with the ultrahazardous activity involved?

IV. Were the jury instructions cumulatively unfair, prejudicial to the plaintiff, and erroneous, which minimized the defendant's duty and over-emphasized the decedent's duty for self-preservation?

### I. FACTS

On August 13, 1990, Howard Furman (decedent) was electrocuted when an aluminum survey rod he was handling contacted a high voltage power line owned by the defendant REC. At the time, decedent was working on a summer survey crew for the Wyoming Highway Department (highway department). That morning, the decedent's crew was sur-veying near the intersection of Campstool Road and Interstate 80, about five miles east of Cheyenne, Wyoming. The decedent's duty that morning was to mark survey monuments with a twenty-five foot, telescoping aluminum rod with a prism placed on top, while the rest of the crew would aim a geodimeter at the elevated prism and record its location. The twenty-five foot rod was necessary because the monuments were well below the point where the rest of the crew was located. After marking and recording the location of one monument, the decedent, working alone, moved on to a second monument which was located underneath a 7,200 volt power line.

At this second monument, the decedent somehow contacted the power line as he attempted to raise the rod high enough for the rest of the crew to see it. None of the rest of the crew witnessed the accident. They went to the decedent only after being unable to contact him on their two-way radios. When they arrived, they found the decedent lying in the field next to the monument.

The monument and the REC owned power lines above it were located next to the entrance to eastbound Interstate 80 from Campstool Road. REC's power line was, at the time and place of contact, somewhere between eighteen feet one and a half inches and eighteen feet two and a quarter inches above the ground. When decedent was found, immediately after electrocution, the rod and prism were determined to have been extended to a length of twenty feet and seven inches.

The National Electrical Safety Code (NESC) is a document created to establish national standards for the construction, installation and maintenance of electricity. Wyoming Statute 37–3–114 requires the Public Service Commission to "adopt * * * the provisions of the current edition of the National Electrical Safety Code[.]" It was undisputed that the 1973 edition of the NESC applied to these wires and that this 7,200 volt line was hanging one foot below the 1973 NESC minimum clearance standard of nineteen feet.

REC's chief engineer testified that the installation designs called for this wire to clear the ground by twenty-three feet. He could not state why the wire was five feet below that design height at the time decedent contacted it, although he gave three possible explanations, including improper installation. If the line had been installed at the height of twenty-three feet as designed, decedent's survey rod, which was extended to a height of twenty feet and seven inches at the time of the accident, would not have come in contact with the power line, and there would have been no accident.

An autopsy, performed on the decedent, revealed the presence of cannabinoids—the active ingredients in marijuana—and phenylpropanolamine—described as an amphetamine. The autopsy and toxicology report did not reveal when the decedent had been exposed to marijuana nor how he was exposed to it. This evidence of the presence of marijuana and amphetamines was admitted into evidence over the objection of the plaintiff.

On October 29, 1992, a jury returned a verdict finding REC 0% at fault, attributing all of the fault to decedent and the highway department. Furman appeals from this verdict.

## II. DISCUSSION

### A. ADMISSIBILITY OF TOXICOLOGIST'S REPORT

Furman asserts that the district court abused its discretion when it admitted a toxicology report, performed as part of decedent's autopsy, because the probative value of the report was outweighed by its prejudicial effect and because there was inadequate foundation. The admitted evidence included testimony from a Cheyenne pathologist and the toxicology report. The report revealed that decedent had tested positive for cannabinoids (marijuana) and for phenylpropanolamine. The pathologist explained the significance of the two substances but could not give an opinion as to the potential effect the substances might have had on decedent at his time of death.

Furman's cross-examination of the pathologist revealed that it could not be determined when or whether decedent had used or simply been exposed to marijuana. It also revealed that phenylpropanolamine is a common cold medicine ingredient.

A trial court's decision on the admissibility of evidence will be affirmed by this court unless it is demonstrated that there has been a clear abuse of discretion. *Barnes v. State,* 858 P.2d 522, 527 (Wyo.1993). This standard applies to trial court decisions concerning the "adequacy of foundation" and relevancy. *L.U. Sheep Co. v. Bd. of County Comm'rs,* 790 P.2d 663, 673 (Wyo.1990). Furman bears the burden of proving that the trial court acted unreasonably in admitting this evidence. *Goff v. Goff,* 844 P.2d 1087, 1092 (Wyo.1993).

Subject to authentication and several rules of exclusion, all relevant evidence is admissible. *Barnes,* 858 P.2d at 526. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401, see also *Barnes,* at 526. Thus, there are two key parts to relevant evidence, probative value and materiality. John W. Strong, 1 *McCormick on Evidence* § 185 at 773 (4th ed. 1992).

It is unlikely that this evidence in this case is even relevant, for I am unable to discern "what fact of consequence" it makes more or less probable. There was no evidence that a drug was ingested, the quantity of drug present, nor impairment anywhere in the case. On the contrary, the only evidence is that appellant's decedent performed his job satisfactorily, without difficulty. The evidence was inadmissible because it was not relevant.

Assuming, arguendo that this evidence was relevant, still its slight probative value was outweighed by the danger of unfair prejudice. One of the rules of exclusion, W.R.E. 403, provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.

Furman asserts that the trial court should have excluded the toxicology evidence because the danger of unfair prejudice outweighed the little probative value the evidence might have had. The evidence failed to establish any quantity of the substances and whether they had any effect at all upon decedent at the time of the accident. No witness testified that the decedent was impaired, unstable, under the influence or unable to perform his job, and there were no physical facts to support an inference of such. On direct examination, the pathologist gave the following testimony as to the significance of the toxicology report:

Q. Based solely on the presence of cannabinoids and phenylpropanolamine in the urine of [decedent] and the quantities that are shown in that test result, can you state any opinion regarding whether or not Howard Furman was under the influence of either of those drugs at the time of his death?

A. *I cannot state that opinion.*

Q. What conclusions can be drawn from those tests?

A. From my point of view as a pathologist performing an autopsy to determine cause of death, *only that those substances were present in the quantities reported by the reference laboratory.* [emphasis added]

While cross-examining this pathologist, Furman's counsel further demonstrated the limits of this evidence by showing that phenylpropanolamine was a common ingredient in cold medicine, not an amphetamine, and by showing that the pathologist could not determine when or how decedent ingested the marijuana. Thus, the probative value of the presence of drugs was low.

Furman claims that the unfair prejudice of the toxicology evidence was high because it portrayed decedent as a user of marijuana and unlawful drugs and because the report misstated phenylpropanolamine as an amphetamine. Unfairly prejudicial evidence is evidence which will likely "stimulate an excessive emotion or * * * awaken a fixed prejudice * * * and thus dominate the mind of the [jury] and prevent a rational determination of the truth." 22 Wright & Graham, *Federal Practice and Procedure: Evidence* § 5215 at 278 (1978) (quoting Wigmore, Code of Evidence, p. 355 (3d ed. 1942)).

The use of unlawful drugs is an emotional, highly charged, controversial subject in present day society. Admission of such evidence was exceedingly harmful to Furman's case. The trial court should exercise extreme caution in admitting this kind of evidence. Such evidence should only be admitted if, in addition to the presence of drugs, there is also some evidence that the amount present will likely result or not result in impairment or there is evidence of impairment. (At least with alcohol, the jury is informed of the percentage of blood alcohol and the legal effect of such amount). There was a total absence in this case of either the amount of drugs present or impairment.

The evidence of the mere presence of drugs leads to an inference of use which permits the further inference of impairment, without any evidence of impairment of Furman or the effect of the quantity found. The evidence of the presence of drugs found at the autopsy was such as was likely to cause "excessive emotion," "awaken fixed prejudice" and dominate the jury's mind. I would hold that the admission of evidence of the presence of drugs was therefore, in this case, an abuse of discretion and error.

## B. INSTRUCTIONS

Furman raises several objections concerning the trial court's instructions to the jury. First, she claims that the trial court erred by rejecting her offered instructions and by accepting REC's offered instructions on the question of each party's duty of care. Second, Furman argues that the trial court erred when it instructed the jury regarding the duties of the highway department.

When reviewing jury instructions for error, we look at the instructions "as a whole and in the context of the entire trial" and determine if the alleged erroneous instruction "fairly and adequately presents the issues for the jury's consideration." *Seaton v. Wyo. Highway Comm'n,* 784 P.2d 197, 206

(Wyo.1989). In order to find reversible error in a trial court's instructions to the jury, Furman must demonstrate prejudice in the form of proof that the instruction confused or misled the jury with respect to the proper principles of law. *DeJulio v. Foster*, 715 P.2d 182, 186 (Wyo.1986).

### Decedent's Duty

Furman argues that the trial court should have given her proffered instruction based on *Gish v. Colson*, 475 P.2d 717 (Wyo.1970). In *Gish*, a wrongful death action, this court granted a new trial because the trial court committed prejudicial error by instructing the jury regarding contributory negligence despite a total lack of evidence to support the defense. See *Gish*, 475 P.2d at 718. In reaching that conclusion, the *Gish* court stated that a decedent is presumed to have exercised ordinary care if there is no eyewitness or other sufficient evidence to rebut that presumption. *Gish*, at 718. Furman's proposed instruction provided:

> In the absence of eye witnesses to an accident or other evidence sufficient to dispel or rebut the presumption, it is presumed that the decedent, acting on the instinct of self-preservation, was exercising ordinary care. However, the presumption becomes important only when negligence is found on the part of the defendant. Absent such a finding, the question of the decedent's due care does not arise.

The instruction is a correct statement of the law. It was for the jury to determine whether the evidence was sufficient to dispel or rebut the presumption and whether REC was negligent. The question of REC's negligence must be resolved upon correct instructions and upon all of the law which includes the presumption of due care for a deceased person where there is no eyewitness to the accident. The jury found REC 0% negligent. It made this finding upon inadmissible evidence of drug use and upon incorrect instructions of law. REC designed this high voltage line to be twenty-three feet above the ground. That may have been because of the proximity of this high voltage line to a heavily travelled state highway and a population center and because REC recognized these and other safety reasons for a higher than minimum height installation in this area. While not required by NESC to install the line at the twenty-three foot height, once having undertaken to do so, there was a duty of care in installation which the jury might consider in determining the negligence of the respective parties. Whether the presumption of due care to which Furman was entitled would have resulted in the jury viewing the negligence of all parties differently we cannot say. We recognize the probability that REC might overcome the presumption. Yet Furman was entitled to have the correct law stated in an instruction given to the jury. We can never know precisely what happened in the jury room, but resolution of these negligence questions, having in mind the presumption of due care, the acts of the parties and the degrees of negligence resulting, is for the jury.

In rejecting Furman's proposed instruction the trial court stated that the presumption was not applicable because there was sufficient evidence for the jury to determine whether decedent used ordinary care. Ordinarily, whether the evidence is sufficient to rebut the presumption is for the jury, not the court. There was no eyewitness to this accident. The evidence of negligence in this case is not such as to take from the jury the question of sufficiency of the evidence to dispel the presumption; and Furman, therefore, was entitled to the instruction on the presumption of due care. The trial court need not give a party's proposed instruction as long as the jury is adequately apprised of the law by the other instructions. *DeJulio*, 715 P.2d at 186. The jury was not instructed upon the presumption of due care, and this was error.

### REC's Duty

Concerning REC's duty, Furman asserts that the instructions incorrectly stated REC's duty of care because they failed to state that REC was engaged in an extrahazardous activity and thus, had to exercise "utmost care." The relevant instructions provided in pertinent part:

## INSTRUCTION NO. 4

Defendant Rural Electric Company had a duty toward [decedent] to exercise due care in the design, installation and maintenance of its lines, to avoid undue risk of harm to him.

## INSTRUCTION NO. 5

When the word negligence is used in these instructions, it means the failure to use ordinary care. Ordinary care means the degree of care which might reasonably be expected of the ordinary careful person under the same or similar circumstances. The law does not say how such an ordinary careful person would act. That is for you to decide.

## INSTRUCTION NO. 14

Each utility shall construct, install, operate and maintain its plant, including structures, equipment and lines, in accordance with accepted good engineering practice.

## INSTRUCTION NO. 15

When electrical lines and equipment are put into service, they shall comply with the safety rules of the National Electrical Safety Code. Electrical lines shall be inspected at such intervals as experience is shown to be necessary. Lines and equipment with recorded defects which could reasonably be expected to endanger life or property shall be promptly repaired, disconnected or isolated.

## INSTRUCTION NO. 18

In the design, construction and maintenance of its power lines, Rural Electric Company's duty was to do so in consideration of the reasonably foreseeable activities which would occur beneath the power lines. A failure to anticipate and guard against a happening which would not have arisen but for exceptional or unusual circumstances is not negligence, nor does the law require those maintaining power transmission lines to anticipate every possible circumstance that might cause injurious contacts with those lines.

If you should find that Rural Electric Company was negligent in the design, construction or maintenance of the power line in question, that negligence is not the proximate cause of the injury unless, under all the circumstances, the injury might have been reasonably foreseen.

The question we must answer is, did these instructions adequately inform the jury of the law in Wyoming or should the trial court have instructed the jury that REC had a higher duty than ordinary care? Furman offered an instruction which required REC to exercise a higher degree of care when dealing with dangerous instrumentalities. In rejecting Furman's proposed instructions asserting the higher standard, the trial court reasoned that there was no Wyoming case law to support the requested instructions and that the other included instructions adequately covered the fact that electricity is a dangerous instrumentality.

The trial court is correct in its conclusion that there is no Wyoming Supreme Court case law which directly designates *high voltage electricity* as an extrahazardous or dangerous instrumentality, requiring a higher standard of care. However, Wyoming case law has dealt with the law governing extrahazardous activities and has to date identified natural gas and mining as dangerous, extrahazardous activities.

In *Ruhs v. Pacific Power & Light*, 671 F.2d 1268, 1271 (10th Cir.1982), the Tenth Circuit, relying on this court's decision in *Pan Am. Petroleum Corp. v. Like*, 381 P.2d 70 (Wyo.1963), interpreted Wyoming law to require a higher standard of care for electrical utilities. Our decision in *Pan Am.*, adopted a higher standard of care when dealing with a dangerous agency. *Pan Am.*, 381 P.2d at 74; see also *Diamond Management Corp. v. Empire Gas Corp.*, 594 P.2d 964, 967 (Wyo.1979) (applying the higher standard to natural gas); *Case v. Goss*, 776 P.2d 188, 192 (Wyo.1989) (applying the higher standard to mining activities); and *Wyrulec Co. v. Schutt*, 866 P.2d 756 (Wyo.1993). The Tenth Circuit correctly analogized high voltage wires to the natural gas in *Pan Am.*, both being extrahazardous instrumentalities.

The notion that high voltage electric wires are dangerous or extrahazardous instrumentalities requiring a high degree of care is well established. See *Denver Consolidated Electric Co. v. Simpson*, 21 Colo. 371, 41 P. 499, 501 (1895); J.D. Lee and Barry A. Lindahl, 1 *Modern Tort Law* § 3.16 p. 63 (1988 Rev. ed. & 1993 Cum.Supp.); W. Page Keeton, *Prosser and Keeton on The Law of Torts* § 34 p. 208 (5th ed. 1984). In *Case*, we looked to the Wyoming Worker's Compensation Act's list of "Extrahazardous Industries" to determine that mining was an extrahazardous activity. *Case*, 776 P.2d at 192. Like mining, electric services is listed under the "Extrahazardous Industries" category of the Wyoming Worker's Compensation Act. W.S. 27–14–108(a)(i)(D)(V) (1991). There can be little doubt that the handling of high voltage transmission wires is extremely hazardous and equally dangerous as natural gas and mining. Therefore, like the natural gas in *Pan Am.* and the mining in *Case*, the high voltage electricity here is a dangerous agency requiring a greater duty of care than "under the ordinary circumstances of life or business where little or no risk is involved." *Case*, 776 P.2d at 192.

That REC owed a higher duty of care because it dealt with an extrahazardous instrumentality cannot be questioned. Therefore, it is clear that the failure to instruct accordingly was error. In at least two jurisdictions it has been held that a failure to instruct on the higher duty of care required of those dealing with extrahazardous instrumentalities is reversible error. *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579 (Colo. 1984); *Widmyer v. Southeast Skyways, Inc.*, 584 P.2d 1 (Alaska 1978); see also *Prosser*, § 34 p. 209. In *Blueflame*, the trial court instructed the jury that the standard of care was " 'that degree of care which a reasonably prudent person would use under the same or similar circumstances.' " *Blueflame*, 679 P.2d at 587. The Colorado Supreme Court held that it was reversible error for the trial court to define the duty as only "reasonable care" and to refuse the plaintiff's instruction, which designated natural gas as a dangerous instrumentality requiring the highest standard of care, because the law in Colorado sets the standard of care for natural gas

suppliers at that higher level. *Blueflame*, 679 P.2d at 587–88. In reaching its decision, the Colorado court advised:

> Instead, the court should have informed the jury by appropriate instruction that, because of its dangerous character, the defendants were obliged to exercise the highest degree of care with respect to the odorization of the propane sold to the plaintiffs. An instruction formulated in terms of the highest degree of care is nothing more than a plain statement to the jury that the inordinate risk posed by escaping propane requires an amount of care commensurate with that risk.

*Blueflame*, 679 P.2d at 588–89.

As the Colorado court did, the Supreme Court of Alaska also reversed a judgment where a trial court instructed the jury that the standard of care for an airline (common carrier) was "what was reasonable under the circumstances" instead of instructing, as the plaintiff requested, that the duty was "utmost care" as required by Alaska law. *Widmyer*, 584 P.2d at 5–6.

Some jurisdictions apply only a single standard of care to all activities whether ordinary, non-hazardous or extrahazardous. *Laney v. Consumers Power Co.*, 341 N.W.2d 106 (1983); *Lovell v. Oahe Elec. Co-op*, 382 N.W.2d 396 (S.D.1986); *City of Decatur v. Eady*, 186 Ind. 205, 115 N.E. 577 (1917). A single standard—ordinary care—is a cop out—an easy solution—but no help at all to a lay jury and no clear statement of what is expected of those dealing with extrahazardous activities. If the circumstances require greater care, what is wrong with saying so? The "ordinary care" rule is surely a bonanza for entities dealing with gas, explosives, high voltage electricity and other hazards, for the jury is mislead when told that "only ordinary care" is required.

Counsel representing persons killed by an extrahazardous activity should understand that they must now establish the greater duty owed by entities engaged in extrahazardous activities. They must now prove by competent evidence how a reasonable careful company would act when engaged in an extrahazardous activity. In essence, plaintiff

must prove "the circumstances" that require a higher degree of care than in undertaking ordinary activities. Proof of dangers involved, of frequency and severity of accidents, probability of death resulting, safety measures and devices available to prevent accidents and prior knowledge of the actor is now required.

The above onerous expensive procedure might be unnecessary if the court followed precedent found in the cases in Wyoming, as in Colorado and Alaska, which uniformly hold that a higher degree of care is required when the defendant is dealing with extrahazardous instrumentalities and require that the jury be so instructed. See *Pan Am.*, 381 P.2d at 74; *Diamond Management Corp.*, 594 P.2d at 967; *Case*, 776 P.2d at 192. Wyoming recognizes different degrees of care, and the jury ought to be so informed.

The instructions in this case fail to state that high voltage electric wires are an extrahazardous instrumentality and fail to state that the standard of care is greater than required in ordinary affairs in life where little risk is involved. Furman was entitled to the requested instructions, and the trial court erred in denying them because they are supported by the evidence and are consistent with the Wyoming law. The phrase "the degree of care which might reasonably be expected of the ordinarily careful person under the same or similar circumstances" relates a far different meaning than stating "the degree of care for those persons engaged in extrahazardous activity is a higher degree of care than required in the ordinary and everyday activities engaged in by all of mankind."

A trial court's refusal to give a requested instruction which is correct as a matter of law is not reversible unless it is prejudicial and affects a substantial right of the complaining party. *Branson v. Roelofsz*, 52 Wyo. 101, 70 P.2d 589, 597 (1937). Here, because the jury was not advised that high voltage electric wires are an extrahazardous instrumentality requiring a higher standard of care, it was misled concerning the Wyoming law which applies to these facts; and, therefore, Furman was denied his substantial right to have the jury correctly instructed on

the applicable law resulting in reversible error. *DeJulio*, 715 P.2d at 186; see also *Cervelli v. Graves*, 661 P.2d 1032, 1036 (Wyo. 1983).

It is suggested that the survey rod being extended to a height of twenty feet seven inches would have contacted the high voltage wire even if it was at a height of nineteen feet in compliance with the NESC and, therefore, the wire, being only eighteen feet above the ground, was not the proximate cause of the accident. We note here that compliance with NESC is only evidence of the exercise of due care. *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 755 P.2d 1319, 1326 (1988). The 7,200 volt line was designed to be installed at a height twenty-three feet above the ground. A jury instructed upon the duty when dealing with an extrahazardous activity could reasonably find that failure to construct the line according to design for greater safety may be evidence of negligence. Had the line been at twenty-three feet as designed, there would have been no accident. But questions of negligence and proximate cause are for the jury to decide under correct instructions on the law. It was error not to instruct the jury that high voltage electricity is extrahazardous requiring a higher standard of care.

### III. CONCLUSION

I would reverse the trial court's judgment because there was error in admission of the drug testing, because the court failed to instruct the jury on the decedent's presumption that he was exercising ordinary care, and because of the failure to instruct on the proper standard of care for those dealing with high voltage electric wires.

I would reverse and remand for a new trial.